1

2

3

4

5

6

7

8    IN THE UNITED STATES DISTRICT COURT

9    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12   JESUS CIANEZ HERNANDEZ,          Case No. 1:12-cv-01661 DAD MJS (HC)

13                                    AMENDED FINDINGS AND
                      Petitioner,     RECOMMENDATIONS REGARDING
14                                    PETITION FOR WRIT OF HABEAS
          v.                          CORPUS
15

16   GREG LEWIS, Warden,              THIRTY DAY OBJECTION DEADLINE

17                     Respondent.

18

19

20        Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus

21   under 28 U.S.C. § 2254. Petitioner is represented by Linnea Johnson. Respondent,

22   warden of Pelican Bay State Prison, is represented by David Eldridge of the office of the

23   California Attorney General.

24        On December 7, 2016, the undersigned issued findings and recommendations to

25   grant Petitioner's petition for writ of habeas corpus, finding that Petitioner was entitled to

26   relief on claim two of the petition and recommending that Petitioner be granted

27   conditional release. (ECF No. 72.) Neither party filed objections; however Petitioner filed

28   proposed corrections to typographical errors in the findings and recommendations. (ECF

No. 73.)

On July 11, 2017, the District Judge declined to adopt the findings and recommendations and referred the matter back to the undersigned for "the filing of amended findings and recommendations addressing the standard of review and application of deference, if any, to the factual findings made by the state court as well as the impact, if any, on the analysis of prejudice under Napue." (ECF No. 74.) Petitioner moved for reconsideration of the District Judge's order. (ECF Nos. 75, 76.) His request was denied. (ECF No. 77.)

On August 28, 2017, the undersigned ordered the parties to submit supplemental briefing on the issues identified by the District Judge. (ECF No. 78.) They did so, and briefing was completed on October 17, 2017. (ECF Nos. 83-86.)

Accordingly, the Court here issues its amended findings and recommendations.

## I.    Procedural Background

Petitioner is in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Stanislaus. On January 11, 1991, Petitioner was convicted by a jury of first degree murder with special circumstances for financial gain and for use of a firearm, and conspiracy to commit murder. (ECF No. 50-5 at 72.) On January 22, 1991, the penalty phase of the trial began. (Clerk's Tr. Vol. 4 at 921.) The jury returned a death verdict against Petitioner on February 1, 1991. (Clerk's Tr. Vol. 5 at 99-91.) On March 21, 1991, Petitioner was sentenced to death. (ECF No. 50-5 at 72.)

Petitioner filed his automatic appeal with the California Supreme Court on August 5, 1999. (ECF Nos. 42, 42-1, 42-2.) On June 2, 2003, the California Supreme Court reversed the death sentence and remanded the case to the Stanislaus County Superior Court. People v. Hernandez, 30 Cal.4th 835 (2003). The California Supreme Court affirmed the convictions, but vacated the finding of special circumstances and reversed the death penalty verdict. (Id.)

In August 2006, upon remand, the Stanislaus County Superior Court imposed a

sentence of life in prison without possibility of parole on the murder conviction, 25 years to life on the conspiracy conviction, three years on each of the firearm-use enhancements, and monetary fines. People v. Hernandez, 2007 Cal. App. Unpub. LEXIS 8324, 2, 2007 WL 2994646 (Cal. App. Oct. 16, 2007). On direct appeal, the California Court of Appeal, Fifth Appellate District modified the monetary fine amount but otherwise affirmed the judgment on October 16, 2007. Id.

While the automatic appeal was pending, Petitioner pursued collateral relief in the form of petitions for writ of habeas corpus in state court. On May 31, 2002 and July 15, 2003, Petitioner filed petitions for writ of habeas corpus in the California Supreme Court. On March 2, 2005, both petitions were denied. See Hernandez on H.C., 2005 Cal. LEXIS 2350 (Cal. Mar. 2, 2005); Hernandez on H.C., 2005 Cal. LEXIS 2351 (Cal. Mar. 2, 2005).

On March 7, 2006, Petitioner filed a second supplemental petition in the California Supreme Court. On May 9, 2007, the California Supreme Court issued an order to show cause why relief should not be granted returnable to the Stanislaus County Superior Court. (See Pet., Ex. 278, ECF No. 1-12 at 8.) An evidentiary hearing was held on February 5, 2008, and on June 4, 2008, the Superior Court denied the writ. (Pet., Exs. R-S, ECF No. 1-3 at 89-195.)

On July 16, 2008, Petitioner filed a habeas petition in the Fifth District Court of Appeal. (Mot. To Dismiss, Ex. C, ECF No. 24.) The court denied the petition on April 8, 2010 and issued its remittitur on May 10, 2010. (Id.) On August 6, 2010, Petitioner filed a petition in the California Supreme Court; it was denied on October 12, 2011. (Mot. to Dismiss, Ex. D.)

On October 10, 2012, Petitioner filed the instant federal petition for writ of habeas corpus in this Court. The Court appointed Petitioner counsel and ordered Respondent to file a response on November 13, 2012. (ECF Nos. 6-7.) On February 4, 2013, Respondent filed a Motion to Dismiss the petition as being filed outside the one-year limitations period prescribed by 28 U.S.C. § 2244(d). (Mot. to Dismiss.) The Court found

1  that Petitioner was entitled to equitable tolling of the one year limitations period and

2  denied the motion to dismiss on September 30, 2013. (ECF Nos. 27, 30.) On October 3,

3  2013, the Court ordered Respondent to file an answer to the petition. (ECF No. 33.)

4  Respondent filed an answer on January 27, 2014. (ECF No. 58.) Petitioner filed a

5  traverse on June 27, 2014. (ECF No. 67.) The matter stands ready for adjudication.

6      The petition raised seven grounds for relief based on the following constitutional

7  violations:

8      1)    That the prosecutor failed to disclose evidence favorable to the defense at

9  trial;

10     2)    That Petitioner's conviction was obtained by the use of false testimony;

11     3)    That Petitioner was denied the right to conflict-free counsel;

12     4)    That Petitioner's counsel was ineffective at the guilt phase of trial;

13     5)    That the prosecution engaged in misconduct resulting in his conviction;

14     6)    That Petitioner is innocent; and

15     7)    That Petitioner is entitled to relief based on cumulative error.

16     However, in Petitioner's traverse, he withdrew claims three through six. (Id. at 11-

17  12.) Accordingly, only claims 1, 2, and 7 remain pending before the court.

18  **II.    Statement of Facts[1]**

19     A. Guilt Phase--Prosecution's Case

20     Alfredo Padilla and Brenda Prado were heroin and cocaine dealers
    who lived in a house in Grayson, a small town in Stanislaus County. Also
21  living in the house (hereafter the Grayson house) were Betty Lawson and
    her boyfriend, Dallas White.
22
    The murder victim, Esther "Cussy" Alvarado, was a heroin addict
23  and prostitute, who would buy heroin from Padilla and Prado and
    occasionally stay at their house. They later banned her from the house
24  because she had not paid for drugs they had given her, and they
    suspected she had stolen a radio from the house.
25

26  [1] The California Supreme Court's summary of the facts in its June 2, 2013 opinion is presumed correct. 28
    U.S.C. § 2254(e)(1). Further, the Fifth District Court of Appeal relied on the California Supreme Court's
27  summary of the facts in the last reasoned state decision of Petitioner's remaining claims. Those facts are
    reprinted verbatim here.

28

On January 4, 1988, between 10:30 and 11:00 p.m., Anthony Ybarra (Ybarra) and his brother Gilbert came to the Grayson house. Gilbert, who was drunk, brought a lawn mower that he had stolen earlier in the day from Johnny Alvarado (no relation to murder victim Esther Alvarado) and which he hoped to exchange for drugs. Ybarra also wanted to buy drugs, but he knew Padilla and Prado would not sell to him because they suspected him of being a police informant.

When Ybarra and Gilbert arrived at the house, they saw Dallas White outside. Ybarra told White he wanted to buy heroin. While they were standing outside talking, Johnny Alvarado drove up, retrieved his lawn mower from Gilbert, and headed home. Gilbert accompanied him, apparently hoping to persuade him not to report Gilbert's theft of the lawn mower to the police. Ybarra remained outside the Grayson house.

As Ybarra and White continued their conversation, Ybarra saw defendant, whom he had known for many years, drive up to Guzman's Bar, some 500 feet away. A woman with long hair was with defendant. After dropping off the woman at the bar, defendant drove to the Grayson house. Ybarra feared defendant because, while working for the police, Ybarra had "set up" the boyfriend of defendant's sister and had testified against him. He therefore hid behind a car as defendant and White entered the house.

Ten to 15 minutes later, Ybarra saw defendant, Padilla, and Prado go out the back door of the house and enter a small trailer. Ybarra crept through a hole in a fence and peeked through a window of the trailer, hoping to find out where Padilla and Prado hid their drugs so he could steal them. Ybarra heard defendant say, "that bitch, Cussy [Alvarado]" was waiting for him at Guzman's Bar, and Prado and Padilla complained that Alvarado had "ripped them off." Defendant offered to beat up Alvarado, and when Prado and Padilla expressed interest, he said he would kill her "for the right price." Prado replied she would give defendant two grams of heroin and an eighth of an ounce of cocaine to kill Alvarado. Defendant said, "Consider it done," and he and Padilla shook hands. Defendant, Prado, and Padilla then left the trailer and returned to the house. Shortly thereafter, Ybarra watched as defendant left the house and got in his car, drove back to Guzman's Bar, picked up Alvarado, and drove off with her between 11:30 and 11:45 p.m. Dallas White then gave Ybarra a ride home.

According to Lorenzo Guzman, the owner of Guzman's Bar, Esther Alvarado left his bar between 11:30 and midnight, after staying 15 to 20 minutes. Guzman saw her enter the passenger side of what he thought was a tan Oldsmobile car.

Between midnight and 1:00 a.m., Rudy Galvan was driving home from work when he saw a body lying by the road. He drove to Guzman's Bar, about a mile away, and asked Guzman to call the police. Stanislaus County Sheriff's deputies responding to the call found Esther Alvarado's body. She had been shot to death. Alvarado's right fingers were muddy, and what appeared to be scratch marks were in the mud next to her body. A thick track of mud was on the road, made by two wheels of a car.

Later that night, Homicide Detective Michael Dulaney drove to the

nearby town of Patterson. At the home of Guadalupe Porter, defendant's sister, Dulaney saw a black and gold Oldsmobile, which belonged to defendant and his sister. The car had a large quantity of wet mud on the left side and the rear bumper; there also was mud on the gas pedal. On the dashboard was a box of Winchester .22-caliber cartridges. On the floor of the car was a similar .22-caliber bullet, and an expended .22-caliber casing was under the seat. On the ground near the car were two shotgun shell casings. The police entered Porter's house and arrested defendant.

Later that morning, Deputy Sheriff Richard McFarren questioned defendant. Defendant said that during the previous night he had taken a woman named Ana (identified by other witnesses as Ana Najera) to a motel in Modesto, dropped her off, and returned to his sister's house. He denied going to the Grayson house. When asked about the mud on the car, defendant said that after dropping off Najera, he had driven through mud on his way to the Candyland apartments to buy drugs. He claimed the bullets in the car were there when it was purchased. He did not say when he had bought the car.

Sheriff's Investigator Mike Clements interviewed Guadalupe Porter, defendant's sister. She said she had borrowed a shotgun and some ammunition from Brenda Prado, but when asked to locate them she could not do so.

That same morning, Ybarra learned from Esther Alvarado's brother that she had been killed. Sometime later, Deputy David Nirschl questioned Ybarra about the lawn mower his brother Gilbert had stolen from Johnny Alvarado. When Ybarra volunteered that he had information about the murder, Nirschl took him to see Raul DeLeon, one of the deputies investigating the murder. Ybarra told DeLeon that he had overheard defendant, Prado, and Padilla planning to kill Esther Alvarado.

Dr. William Ernoehazy performed an autopsy on Esther Alvarado. Her body contained a .22-caliber bullet, as well as shotgun pellets, wadding, and a slug. The path of the slug through her body indicated that it had been fired downward into her back at a distance of roughly three feet while she was lying on the ground. Criminalist John Yoshida testified that the copper wash and the design of the bullet found in Alvarado's body were "exactly the same" as the Winchester cartridges found in defendant's car.

Shortly after the murder, Brenda Prado moved to Oklahoma, where she lived with her daughter, Valerie Castillo. Three months later, Castillo found a double-barreled sawed-off shotgun hidden in the springs of a couch Prado had brought with her. According to Criminalist Michael White, the two shell casings found in defendant's front yard the morning after Alvarado was killed were fired from this shotgun, the slug found in Alvarado's body was "probably" fired from the gun's right barrel, and the wadding found in Alvarado's body was "consistent with" the shells retrieved from defendant's front yard.

Eleven months after the murder, Deputy District Attorney Michael Stone and District Attorney Investigator Alan Fontes were preparing for the trial of Alfredo Padilla who, like defendant, was charged with Alvarado's murder. Looking closely at a slide projection of Alvarado's body taken at the crime scene, they discovered that what sheriff's deputies had

thought to be scratch marks in the mud next to her body were letters spelling "Jesse" (defendant's first name). According to Dr. Ernoehazy, who performed the autopsy, Alvarado died some 15 minutes after being shot, and she could have remained conscious long enough to write defendant's name in the mud.

Deputy Daniel Cron checked defendant's car for fingerprints. On the outside of the passenger's side window he found a latent print that matched Alvarado's right middle finger.[fn2]

**FN2**: Alfredo Padilla and Brenda Prado were tried separately for Alvarado's murder. Padilla was convicted of capital murder and sentenced to death, and we affirmed the judgment. (<u>People v. Padilla</u> (1995) 11 Cal.4th 891 [47 Cal. Rptr. 2d 426, 906 P.2d 388].)

B. <u>Guilt Phase--Defense Case</u>

Defendant presented an alibi defense, claiming that someone living at the Grayson house had killed Esther Alvarado and had framed him by writing "Jesse" in the mud next to Alvarado's body.

Fifteen-year-old Steven Rodrigues, Guadalupe Porter's son and defendant's nephew, testified that on the night of the murder, defendant left their house shortly after 6:30 p.m. to take Ana Najera home. Defendant returned an hour later and watched television with Steven until about 10:30 p.m., when they fell asleep in the living room. Defendant was still asleep at 6:30 the next morning when Steven, a paper boy, got up to deliver newspapers.

Steven also testified that Alfredo Padilla and Brenda Prado had come to visit on New Year's Eve (four days before the murder of Alvarado) and Padilla in celebration fired off a sawed-off shotgun in front of the house. According to the defense, this explained the presence of the shotgun shells the police found in front of the house the morning after the murder.

Defendant's sister, Guadalupe Porter, testified that Esther Alvarado had often been a passenger in defendant's car. That, the defense claimed, explained the fingerprint the deputies had found on the car window.

Through testimony of defense witnesses and cross-examination of the prosecution's witnesses, the defense tried to show that Ybarra had left the Grayson house long before defendant arrived there. Therefore, the defense theorized, Ybarra must have made up the conversation in which defendant, Padilla, and Prado discussed killing Esther Alvarado. According to the defense, Ybarra's motivation was to avoid prosecution for helping to steal Johnny Alvarado's lawn mower and to obtain other favors from the Stanislaus County District Attorney's Office. The defense presented evidence of Ybarra's long criminal record for theft and for alcohol and drug-related offenses and the repeated dismissal of these charges by the district attorney's office, possibly in exchange for information. To refute Ybarra's testimony that he no longer used drugs, Donald Yarbary testified that Ybarra had used heroin with him the week before trial.

The defense also tried to show that no conversation could have

7

occurred in the trailer where, according to prosecution witness Ybarra, he overheard defendant plan to kill Esther Alvarado. Dallas White described the trailer as a "dump" that "nobody used." His testimony was corroborated by Enrique Jiminez, a drug user and frequent visitor to the Grayson house. Tom Lilly, who moved into the Grayson house after Alvarado's murder, described the trailer as "all caved in, [with] water in it and garbage all the way up."

C. Penalty Phase--Prosecution's Case

The prosecution presented evidence that in 1982 defendant killed Robert Caseri (Caseri). Defendant was arrested for this crime, but was not prosecuted because the district attorney's office believed it had insufficient evidence.

Caseri lived in Patterson, Stanislaus County. On February 15, 1982, he telephoned his sister, Karen Linn Hatcher. He was crying. He told Hatcher to remember the names of defendant, Earl Rodrigues, and Arnulfo "Fish" DeLeon, because they were going to kill him. When Hatcher saw Caseri two days later, he was nervous and again said that defendant, Rodrigues, and DeLeon were going to kill him. She never saw her brother again. Nor did her mother, Billie Jean Caseri, who last saw her son on February 18, 1982.

The next week, the two women made inquiries in town to find out what had happened to Caseri. They talked to Sal Banda, who worked at the Red Lion Cocktail Lounge in Patterson. Banda said that on the night of February 19, 1982, he saw Caseri buying drinks for defendant and Rodrigues; that defendant and Caseri got into a fight, and Caseri was hurt; that Banda had offered to take Caseri to the hospital, but Caseri refused, saying that defendant and Rodrigues were going to "get" him. Banda had not seen Caseri since.

On March 2, 1982 Patterson Police Officer Tony Zavala, who was investigating Caseri's disappearance, spoke to Banda. Banda said that on the night of Caseri's disappearance, Banda saw him drinking with defendant, DeLeon, and Rodrigues. Caseri had a "wad of bills" and was paying for the drinks. At Banda's suggestion, Caseri gave the money to Patty Poso, another bartender, for safekeeping. Later, Banda saw that Caseri was bleeding from the head, and Caseri told Banda that defendant had beaten him up because he had refused to buy defendant more beer. Caseri left the bar about 11:00 p.m. but returned "later on," and Banda saw defendant sitting next to Caseri drinking beer. Around midnight, Banda looked for Caseri, but he and defendant were gone. DeLeon and Rodrigues were still in the bar. (At trial, Banda denied remembering much of this statement, and his conversation with Zavala was admitted as a prior inconsistent statement.)

Officer Zavala also interviewed Earl Rodrigues, who said that on the night Caseri disappeared he was at the Red Lion with defendant when they saw Caseri, an old friend of defendant's. Defendant and Caseri left for a short time and then returned, and Caseri bought "everybody" several rounds of beer. Later, threats were exchanged between defendant and Caseri. The two men, accompanied by Rodrigues, then went outside the bar. There, defendant knocked Caseri down, grabbed him by the hair, and slammed his head into the pavement. Rodrigues and several other men

broke up the fight, and they all went back in the bar. After midnight defendant told Rodrigues that he and Caseri were going to another bar, and the two of them left. At 1:30 a.m., Rodrigues left the bar and discovered his car was gone. Defendant, who had the keys, returned with the car a few minutes later, and they drove home. In a second interview a month later, Rodrigues gave a similar statement, with the only significant difference being that he mentioned that defendant left the bar for a period of time after the fight, and then returned before departing with Caseri. (As with witness Banda, Rodrigues denied remembering much of these statements, which were then admitted as prior inconsistent statements.)

Between 11:00 and 11:30 p.m. on the night Caseri disappeared, Patterson Police Officers Louis Bonacich and Jeff Shively saw a pool of fresh blood, 12 to 15 inches in diameter, in an alley outside the Red Lion bar. They checked the Red Lion and two other nearby bars, but found no indication that anyone had been in a fight or had been injured.

Caseri's body, severely decomposed, was found in the Delta-Mendota Canal in April 1982. According to Dr. William Ernoehazy, who performed an autopsy on the body, Caseri had been dead one to three months. He had been killed by at least six blows to the head, which had been inflicted by both ends of a claw hammer.

In the early morning hours of April 3, 1982, Jack Price, then a Patterson police officer, waited in plain clothes outside defendant's home to arrest him when he arrived. Defendant drove up at 1:30 a.m. As he got out of his car, a neighbor warned him that a police officer was present. Defendant got back in his car and drove away at high speed. Several blocks later defendant stopped the car abruptly and tried to run away, but halted when he heard Price "rack" his shotgun. Referring to a woman who was a passenger in his car, defendant said, "Leave her alone, man. She don't know nothing about it." At that point, however, Price had not told defendant why he was arresting him, and defendant never clarified what it was that the woman knew nothing about.

Two weeks later, Criminalist Kenneth Penner tested Earl Rodrigues's car for blood. He found small stains of human blood on the back of the front passenger seat and on the foam mat in the back of the car. The backseat of the car had been removed and was never tested.

The prosecution also presented evidence that in 1977 defendant and an accomplice robbed Mary Toste and her mother at their small market in Turlock, Stanislaus County. Defendant used a gun in the robbery, and as he fled he fired a shot into the store counter near Mary's legs. He was convicted of robbery.

The prosecution presented documentary evidence that defendant was convicted of burglary, a felony, in 1983.

D. Penalty Phase--Defense Case

At the penalty phase of his capital trial, defendant presented not only evidence to rebut the prosecution's claim that he had killed Caseri, but also evidence about his childhood and drug use.

To explain the bloodstains in Earl Rodrigues's car, Guadalupe

Porter (defendant's sister and Rodrigues's ex-wife) testified that on April 3, 1982, she, Rodrigues, and three of their children were riding in the car when it was involved in an accident. Several occupants of the car were injured and bled. The family went to the hospital, where Rodrigues was arrested for the murder of Caseri. To explain the removal of the rear seat of the car (which would have been covered with blood if it had been used to transport Caseri), Porter said her brother-in-law, Alex Rodrigues, had removed it because he wanted to get some tools in the car's trunk, and he did not have a key. To corroborate Porter's testimony about the accident the defense presented hospital records and testimony from the officer who arrested Rodrigues at the hospital.

Porter also testified that as a child defendant had many friends. Later, when his sister Esther went to jail, defendant supported and took care of her four children for about four months.

Ernesto Hernandez, defendant's brother, testified that he and defendant grew up in a family of 11 children, five of whom were alive at the time of trial. Their father was a farm laborer, and neither he nor defendant's mother abused the children. As a child, defendant was an altar boy, obeyed his parents, got along with others, and stayed out of trouble. He did well in school, liked sports, and stayed after school to improve his grades.

The defense introduced academic records to show that defendant did well in courses at Columbia Junior College in Tuolumne County, which he took while incarcerated at the California Youth Authority.

Nurse Rick Lindsey of the Haight-Ashbury Drug Detoxification Clinic in San Francisco described heroin addiction as a "chronic and progressive disease," which "without treatment always gets worse." He explained that it is very difficult to stop using heroin because, although most of the physical symptoms of withdrawal will be gone in a week, the psychological dependency and "intense craving" for the drug persist for years. Noting that defendant once told a probation officer he had started using heroin at the age of 14, Lindsey testified that heroin use from this early age would be an "extremely severe" addiction that would cause arrested psychological development. Defendant also introduced jail records showing that he was treated for heroin withdrawal when he was taken to the jail after being arrested the morning after the death of murder victim Esther Alvarado.

People v. Hernandez, 30 Cal. 4th 835, 845-853 (Cal. 2003).

## III. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the

conviction challenged arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

**IV.    Standard of Review**

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); <u>Williams v. Taylor</u>, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**1.    Contrary to, or an Unreasonable Application of, Federal Law**

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) citing <u>Williams</u>, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The

"clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable."  Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009), quoted by Richter, 131 S. Ct. at 786.

## 2.    Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006).  Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas

petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Richter instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75). AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id. To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3. Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

U.S. 112, 121-22 (2007) (holding that the <u>Brecht</u> standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. <u>See</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279, 310 (1991); <u>United States v. Cronic</u>, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the <u>Strickland</u> prejudice standard is applied and courts do not engage in a separate analysis applying the <u>Brecht</u> standard. <u>Avila v. Galaza</u>, 297 F.3d 911, 918, n. 7 (2002). <u>Musalin v. Lamarque</u>, 555 F.3d at 834.

**V.     Review of the Petition**

   **A.     Claim One: Prosecution's Failure to Disclose Favorable Evidence**

   Petitioner, in his first claim, asserts that the state withheld, concealed, and destroyed material and favorable evidence to Petitioner's defense in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). (Pet. at 37-74, ECF No. 1-1.)

      **1.     State Court Decision**

   Petitioner first presented this claim by way of a supplemental petition for writ of habeas corpus to the California Supreme Court filed on March 16, 2006. (ECF No. 51.) On May 9, 2006, the California Supreme Court ordered Respondent to show cause before the Stanislaus County Superior Court why relief should not be granted based on Petitioner's claim that the prosecution failed to disclose exculpatory evidence. (ECF No. 51-5.) After conducting an evidentiary hearing, the Stanislaus County Superior Court denied the petition on June 4, 2008. (ECF No. 52-3, 52-9.)

   On July 14, 2008, Petitioner filed a petition for writ of habeas corpus with the California Court of Appeal, Fifth Appellate District. (ECF No. 53.) On April 8, 2010 the court denied the petition in a reasoned decision. (ECF No. 53-10.) On August 11, 2010, Petitioner filed a petition for writ of habeas corpus with the California Supreme Court. (ECF No. 54.) On October 12, 2011, The court denied the petition without comment. (ECF No. 54-7.) "[W]here there has been one reasoned state judgment rejecting a

federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the "look through" presumption. Id. at 804. Since the Court of Appeal was the last court to issue a reasoned opinion on this issue, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.[1] With regard to the Brady claim, the Court of Appeal said in its opinion:

> Petitioner Jesus Cianez Hernandez has filed a petition for habeas corpus in this court alleging that during his murder trial the prosecution committed Brady (Brady v. Maryland (1963) 373 U.S. 83) violations by withholding evidence and giving false testimony regarding an important witness, Anthony Ybarra. Petitioner claims these violations bolstered the credibility of Ybarra, and petitioner is entitled to reversal and retrial of his convictions and the special circumstance.

> Statement of the Case and Facts

> Petitioner was tried beginning in late 1990 and concluding in early 1991 for the January 4, 1988, first degree murder of Esther Alvarado. He was convicted of one count of murder and one count of conspiracy to commit murder. In addition, a special circumstance of an intentional murder committed for financial gain was found true as to both counts. It was also found by the jury that petitioner personally used a firearm in the commission of the offense. The jury returned a verdict of death, and petitioner appealed to the California Supreme Court.

> In 2003 the California Supreme Court struck the financial gain special circumstance based on the conspiracy conviction and affirmed the remaining convictions and special circumstance. The judgment of death was reversed and remanded to the trial court for further proceedings. (People v. Hernandez (2003) 30 Cal.4th 835.)

> We set forth the facts as summarized by the California Supreme Court in its 2003 opinion....[2]

> After petitioner was convicted and while his appeal was pending in the California Supreme Court, petitioner's habeas counsel tried to investigate and prepare a habeas petition. Counsel repeatedly sought to review the prosecutor's file and made requests for any evidence favorable to the defense.

> On January 1, 2003, new legislation became effective granting the right to postconviction discovery in capital cases. (Pen. Code, § 1054.9.) While petitioner's counsel continued to seek discovery, his two petitions in the California Supreme Court, In re Jesus Cianez Hernandez, No.

---

[1] While there was a reasoned decision from the Superior Court, the decision of the Court of Appeal supersedes that decision as the last reasoned state court decision.

[2] The facts, as set forth by the California Supreme Court were set forth in Section II, *supra.*

S107230, and <u>In re Jesus Cianez Hernandez</u>, No. S117549, were denied on March 2, 2005.

Based on the discovery that was eventually provided to petitioner's counsel, petitioner filed a new petition for writ of habeas corpus in the California Supreme Court on March 7, 2006. (S141716.) On May 9, 2007 the California Supreme Court issued an order to show cause returnable before the Stanislaus Superior Court for a hearing to determine why the relief prayed for in the petition should not be granted on the grounds that the prosecution failed to disclose material, exculpatory evidence, and that false evidence was presented at trial.

An evidentiary hearing was held in Stanislaus Superior Court beginning February 5, 2008. The court admitted documentary exhibits introduced by petitioner. These documents were claimed to have not been disclosed to defense counsel at trial. (These same exhibits are attached to the petition before this court.)

Contrary to the prosecutor's theory at petitioner's murder trial that Ybarra was testifying as a concerned citizen and received no benefits other than being placed in the witness protection program, petitioner claims that the first series of documentary exhibits shows that Ybarra received leniency and/or benefits for his testimony. Exhibit A is a handwritten note from the probation department's file noting that Ybarra was booked and committed for his 1988 theft with a prior theft conviction (hereafter theft conviction) on December 27, 1988, and released on December 30, 1988.

A June 6, 1989, report from the probation officer is exhibit B. The report states that Ybarra reported to the officer, his probation goals were discussed, and he signed his terms of probation. Ybarra was accompanied to the meeting by Alan Fontes, a criminal investigator for the district attorney's office. The probation officer noted that Fontes explained that Ybarra was released early from jail because he was in the "victim witness" program regarding a murder case. The business card of Fontes was attached to the report.

A probation department memo dated April 3, 1990, is addressed to a "court officer" and states that Ybarra was released on December 30, 1988, through the "Witness Assistance Program." The memo went on to note that this should not be stated in open court if the judge asks why Ybarra was released so early. If there is a request to know why this occurred, the officer should provide the information in chambers. (Exhibit C.)

An "adult court worksheet" is exhibit D. It appears to have been prepared in June of 1991 and it states that nothing should be in Ybarra's probation report that he is a witness in the Padilla or Hernandez murder cases.

A "Stanislaus County probation adult court action sheet" is exhibit E and contains numerous entries regarding Ybarra's probation, ending with an entry on June 12, 1991, that he violated his probation. An entry dated December 27, 1988, states: "36 Months Formal Probation; 240 Days County Jail 15 Days Credit For Time Served 7 days Credit for Good & Work." It also stated his jail release date as December 30, 1988.

A handwritten note by a probation officer on January 15, 1990, states that no one was home during an attempted home visit. The next day a call was placed to Fontes to explain to him that if Ybarra did not report to the probation department his probation would be violated.[fn2] (Exhibit F.) Ybarra had a dirty drug test on January 23, 1990, and on January 26, 1990, the probation officer phoned Fontes and told him that Ybarra needed to see the officer regarding his dirty drug tests. (Exhibits G and H.)

**FN2:** Petitioner claims the date of this note is January 15, 1990. The copy of the note in the petition is cut off on the right margin and does not contain the month. Since there is no disagreement about the date we will assume it is January.

In a supplemental probation officer's report filed April 17, 1990, the probation officer recommends that Ybarra's probation be revoked due to his dirty drug test. The report stated that one of the conditions of Ybarra's December 27, 1988, grant of probation was that he report in person to the probation officer within 14 days from his date of release from custody and that Ybarra reported on June 6, 1989. Under the section of the report listing incarceration information, the report states that Ybarra was committed on December 27, 1988 and released on December 30, 1988. (Exhibit N.) Ybarra's probation was revoked on June 11, 1990, and he was given credit for time served of 25 days. (Exhibit O.)

A probation officer's report dated January 7, 1991, indicates that Ybarra had been arrested since his last visit. Ybarra did not know if anything had been filed based on his new arrest and told the probation officer that Fontes was working on his new offense. Ybarra did not know if Fontes was going to make a deal with the police for him. Defendant was still testifying in the murder trials. (Exhibit I.)

On June 12, 1991, after the trial was completed in petitioner's case, Ybarra's probation was once again revoked on the theft case and he was sent to prison for that theft (1988) and two additional thefts committed in 1990 and 1991. He was given credit for time served of 59 days. (Exhibits P & Q.)

The final documentary exhibit in the series of documents that claim to show that Ybarra received benefits from testifying is a group of memorandums and receipts for money given to Ybarra from the district attorney's office in late 1988. On November 28, 1988, Fontes sent a memorandum asking for $ 60 to give to Ybarra so he could leave the area. Fontes described Ybarra as a material witness in the Padilla murder case. (Padilla was charged with and convicted of the same crimes as petitioner. Padilla was tried separately, almost a year before petitioner.) Fontes requested $ 150 for Ybarra on December 8, 1988, and explained that if the district attorney's office had to pay to keep Ybarra in a hotel and pay for his meals it would probably cost $ 75 a day. Fontes noted that they would not have a case against Padilla without Ybarra's testimony. The request was approved, and it was noted that the money was advance money for witness expenses "which may or may not need to be deducted for any claim he may file." A third memo, dated December 22, 1988, asked for additional money, noting that Ybarra has been unable to work because he has had to stay in the area in case he is needed to testify in the Padilla

case. The request was approved, but only for $ 60. (Exhibit J.)

Exhibit K is a group of documents establishing that Ybarra acted as a confidential informant beginning in 1981. Petitioner claims these documents establish that Ybarra had a much more extensive history as a criminal informant than revealed at trial.

Exhibit L is a document dated March 2, 1988, showing that Ybarra acted as an informant in a drug case in February of 1988, after the murder.

When Ybarra was arrested on December of 1992 it was noted on his intake worksheet that it was believed that Ybarra is an "old 300" who "burned every chance he was given." A "300" is a term given to an informant. (Exhibit M.)

Testimony was taken at the evidentiary hearing on the order to show cause in superior court. Petitioner's trial counsel, Kirk McAllister, testified that part of his defense was to show at trial that Ybarra got a deal from the prosecution. McAllister testified that the above summarized documents were not disclosed to him during the discovery process prior to or at petitioner's trial. McAllister recalled that the district attorney claimed they had no agreement with Ybarra for special treatment in exchange for his testimony during petitioner's trial. (Exhibit R.)

Ybarra testified in petitioner's case and in the Padilla case. He testified at the hearing on the order to show cause that he did not receive any deals, favors, benefits or leniency for his testimony. Ybarra stated that he served his sentence on the theft conviction, having been first "locked up" in Stanislaus County and then transferred to Tuolumne County by the district attorney's investigator, Fontes, for security reasons. He said he was on felony probation after serving his eight-month sentence.

Ybarra was asked a series of questions regarding whether he was given money by the district attorney's office for his testimony and whether he testified falsely at trial that he did not receive any money. Ybarra said he did not receive any money for his testimony in petitioner's trial. The money he received in December of 1988 was after he testified at the preliminary hearing. It was not clarified if the money was related to petitioner or Padilla or both. Ybarra acknowledged he signed two receipts in December for the receipt of money. He did not equate this as receiving money but as the district attorney's office helping him out with rent and other expenses. Ybarra testified that he did not get any money for petitioner's case. He did get money in the Padilla case for rent, gas, and transportation.

Ybarra acknowledged he had been an informant in 1981, 1982, 1984, and also in 1988 after the murder. His informant activities after the murder were an effort to get leniency for his brother's act of stealing the lawn mower.

Ybarra did not receive or expect any favors for his testimony in petitioner's case; he walked into the police department and told a detective what transpired the night of the murder. He did not recall exactly when he went to the police with his report, but he went voluntarily.

Fontes testified at the hearing that he did not give Ybarra money except the money he received through the witness protection program. Fontes said that any money Ybarra received prior to entering the witness protection program was expense reimbursement. Fontes arranged for Ybarra to serve his county jail sentence in Tuolumne County for Ybarra's protection. Although there were no documents to show that Ybarra served his sentence in Tuolumne County, Fontes testified that he knew Ybarra was there because Fontes went there and picked him up. Ybarra may have been released a few days early from his eight-month sentence, but he served the majority of his time in Tuolumne County. Fontes did not make any arrangements for Ybarra's early release. Fontes testified that to his knowledge no one from the prosecutor's office gave Ybarra money to testify for the prosecution.

The superior court also reviewed testimony from petitioner's trial in ruling on the order to show cause. The trial testimony of Ybarra (exhibit T to the petition) began with Ybarra admitting he was a convicted felon and had served an eight-month sentence for a theft with a prior theft conviction. He also admitted he used heroin and cocaine and was using at the time of the murder. He had known the victim since they were young; at the time of the murder, they were still friends and did drugs together.

Ybarra explained that Prado and Padilla would not sell drugs to him because he had a record of being an informant. When petitioner showed up at the Lawson home (where Padilla and Prado lived), Ybarra hid because he was an informant with the Drug Enforcement Unit of Stanislaus County and he had set up the boyfriend of petitioner's sister. Ybarra testified against the boyfriend.

Ybarra stayed in hiding and watched the occupants of the house to see if he could discover where they hid their drugs. When asked why he wanted to know that, Ybarra responded, "I was a heavy user and I was a thief."

The death of the victim became known to Ybarra the morning after. He went to the police within two weeks at the most to answer questions about the stolen lawn mower, and then he eventually told them what he knew about the murder.

On cross-examination, Ybarra said he had used heroin since he was 17 years old (he was 34 years old at the time of trial) and had been addicted since 1984. He testified that he had been in the Lawson home almost every day buying drugs until they quit selling drugs to him. They quit selling drugs to him after he was arrested for the theft in 1987 that resulted in the theft conviction and learned that he was kept in protective custody after his arrest. He was allowed in the house a few times in 1987, but on each occasion he was strip searched when he entered. He did not work as an informant in relation to the theft conviction incident.

Ybarra was asked if he had been an informant before his arrest for the theft conviction incident. He replied, yes. He was then asked, "And when you had been an informant before was that in 1984?" He said yes. The next question was, "And it was in 1984 that you became an informant for the county drug enforcement unit. Is that right?" Ybarra said yes. He explained that he became an informant at that time because he had a felony burglary charge pending against him. After he became an informant

the burglary charge was dropped.

Ybarra admitted he had been convicted of petty theft four or five times, had been convicted of grand theft, and his latest conviction was a felony of petty theft with a prior (the theft conviction). He had charges currently pending against him for a September 1990 arrest for shoplifting. Ybarra said that in 1984 when he worked as an informer he had to work five cases to get the charges dismissed. He worked seven cases because he wanted more money to buy drugs. (Exhibit T.)

Fontes was asked at trial if he was aware of any efforts to do anything for Ybarra that involved financial considerations. He said yes. He was then asked if he was familiar with the witness protection program. He said yes and explained the program to the jury. Fontes testified that Ybarra became involved in the witness protection program in May of 1989 after he was released from county jail and had an altercation with his brother.

Fontes explained that the money from the witness protection program came through the sheriff department and the funds were disbursed to Fontes to monitor. The following questioning occurred.

"Q. [Prosecutor] Again when you're doing these dealings what was the date?

"A. [Fontes] This was in June of '89.

"Q. Was there any participation of Mr. Ybarra in a Witness Protection Program before June of 1989?

"A. No.

"Q. Was there any money given to him either directly or indirectly to your knowledge prior to that time?

"A. No.

"Q. How were funds [disbursed] then if you say you monitored them?

"A. There were certain guidelines. He was allowed -- you were allowed to spend so much money in regards to food, utility and rent and incidental expenses. What I did was -- is found a place, apartment for him to live in under an assumed name and I --"

The questioning continued with questions about the witness protection program.

Fontes assisted Ybarra in obtaining a new identity by getting him a driver's license and Social Security card under an assumed name. Money was allocated for rent, groceries, supplies, utilities and incidentals. At the first of the month, Fontes would pay Ybarra's bills and do his grocery shopping for him. Ybarra would receive $75 a month for haircuts, newspapers, laundry, etc. Fontes performed these services for 11 months, beginning in June of 1989 and ending in May of 1990. Approximately

$7,000 was disbursed for Ybarra during this time period.

Prior to Ybarra being involved in the witness protection program, Fontes arranged for Ybarra to serve his jail sentence in another county under an assumed name. He did not want Ybarra serving his jail sentence for his theft conviction in the same jail as the three defendants who were in custody for the murder. Fontes testified that for the theft conviction Ybarra got probation and jail time. Fontes said that Ybarra served "eight months," from December to May.

Fontes transported Ybarra back and forth to and from jail several times, but he never made any effort to get charges dropped against him or to get him out of jail on the theft conviction. Fontes did ask the jail to put Ybarra in a single cell and then called a judge to get Ybarra released from jail when he was arrested for another charge during the pendency of the murder charges. Fontes also accompanied Ybarra to the probation department a couple of times.

Fontes testified that prior to Ybarra entering the witness protection program Fontes did not promise Ybarra money and did not say anything to him that would cause him to think he might be able to get some money. (Exhibit U.)

Holly Berrett, a chief deputy in the district attorney's office, testified at petitioner's murder trial. She testified that Ybarra was not given any deals on the theft conviction in return for his testimony in the murder trials. The only consideration Ybarra was given was that the district attorney's office would recommend that he be allowed to serve his time in another county under an assumed name.

On cross-examination, Berrett detailed Ybarra's prior record as including a misdemeanor arson conviction, a misdemeanor weapons offense, two misdemeanor receiving stolen property convictions in the 1980's, one prior petty theft conviction, and three other misdemeanor convictions. In addition, he had the 1987 felony theft conviction that was disposed of in 1988. All charges against Ybarra for the stolen lawn mower that occurred the day of the murder were dismissed because the deputy district attorney found that Ybarra was factually innocent. (Exhibit W.)

In closing arguments to the jury at petitioner's murder trial, the People agreed that Ybarra was an ex-felon, "doper" and a thief. But they argued that Ybarra "spilled his guts" early on without any deals. Ybarra was a friend of the victim, he did not ask for money before telling his story, and he did not ask for help with his pending charges. The prosecutor argued that Ybarra either told the truth or he made up the entire thing. The prosecutor then pointed out the strength of the evidence linking petitioner to the murder, and the fact that Ybarra and the bar owner saw the victim get into a car linked to petitioner at the bar late in the evening before she was murdered. The prosecutor acknowledged that Ybarra received $ 7,000 through the witness protection program, yet he had no expectation of anything when he initially told his story to law enforcement. (Exhibit V.)

Petitioner's closing argument to the jury emphasized that Ybarra got $ 7,000 in goods and services for being an informer in this case. Petitioner's counsel argued that Ybarra knew the system and knew how it worked. Ybarra was freed of criminal responsibility for the lawn mower

theft and had avoided a state prison sentence. In addition, counsel argued that Ybarra had been arrested many times since 1988 yet he had only done a little bit of jail time. (Exhibit X.)

It was stipulated at the hearing on the order to show cause that the Tuolumne County Sheriff's Department purges its records after five years and does not have any records of Ybarra's incarceration. In addition, it was stipulated that the records from the Stanislaus County jail and the district attorney's office regarding Ybarra show no records of incarceration from December 30, 1988, to June 1, 1989. The release form on December 30, 1988 from the Stanislaus County jail has the letters "OC" and this stands for out of county. (Exhibit Y.)

The Stanislaus Superior Court denied the petition for writ of habeas corpus. (Exhibit S.)

Petitioner filed a petition for writ of habeas corpus in this court on July 16, 2008. We issued an order to show cause on March 13, 2009.

Discussion

The petition for writ of habeas corpus has two claims. One is that the prosecutor suppressed evidence favorable to the defense. The second is that the prosecutor presented false testimony to the jury.

In Brady v. Maryland, supra, 373 U.S. 83, "the United States Supreme Court held that a defendant's right to due process is violated when 'favorable' evidence that has been 'suppressed' by the prosecution is 'material' to the issue of guilt or punishment. The violation occurs even when the prosecution has not acted in bad faith and the favorable evidence has not been requested." (In re Pratt (1999) 69 Cal.App.4th 1294, 1312.)

"The defendant must establish that the undisclosed information was favorable to the defense and that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. [Citation.] Such a reasonable probability exists where the undisclosed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [Citations.] Impeachment evidence, as well as exculpatory evidence, falls within the scope of Brady." (Eulloqui v. Superior Court (2010) 181 Cal.App.4th 1055, 1063.)

"The California Supreme Court has also repeatedly stressed the focus upon the importance of the undisclosed evidence to the trial. In People v. Pensinger (1991) 52 Cal.3d 1210, the court explained Brady materiality as follows: 'Under the federal Constitution, "the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."' (Id. at p. 1272, quoting [United States v. Bagley (1985) 473 U.S. 667, 678].) In re Brown (1998) 17 Cal.4th 873 (Brown), the court again addressed the standard: '[W]e turn to the question of materiality, for not every nondisclosure of favorable evidence denies due process. "[S]uch suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with 'our overriding concern with the justice of the finding of guilt,' [citation] a constitutional

error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."' (Id. at p. 884, quoting Bagley, supra, 473 U.S. at p. 678.) '"Bagley's touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."' (Brown, at p. 886, quoting [Kyles v. Whitley (1995) 514 U.S. 419, 434].) '"One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."' (Brown, at p. 887, quoting Kyles, supra, 514 U.S. at p. 435.) Recently, in People v. Zambrano (2007) 41 Cal.4th 1082, disapproved on a different ground in People v. Doolin (2009) 45 Cal.4th 390, 421, footnote 22, the California Supreme Court reiterated the standard of materiality under Brady: 'Evidence is material [under Brady] if there is a reasonable probability its disclosure would have altered the trial result.' (Zambrano, at p. 1132.)

"The Brown court also explained, 'The sole purpose [of Brady and its progeny] is to ensure the defendant has all available exculpatory evidence to mount a defense. To that end, a document sent but not received is as useless as a document not sent at all. In both situations, the right to a fair trial is equally denied.' (Brown, supra, 17 Cal.4th at p. 881.) And in [City of Los Angeles v. Superior Court (Brandon) (2003) 29 Cal.4th 1, 8], the California Supreme Court stated that the materiality standard of Brady does not vary based upon when a Brady claim is raised: 'Although Brady disclosure issues may arise "in advance of," "during," or "after trial" [citation], the test is always the same. [Citation.] Brady materiality is a "constitutional standard" required to ensure that nondisclosure will not "result in the denial of defendant's [due process] right to a fair trial." [Citation.]'" (Eulloqui v. Superior Court, supra, 181 Cal.App.4th at p. 1067.)

"Penal Code section 1473, subdivision (b)(1) provides that a writ of habeas corpus may be prosecuted if '[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration....' [¶] 'False evidence is "substantially material or probative" if it is "of such significance that it may have affected the outcome," in the sense that "with reasonable probability it could have affected the outcome...." [Citation.] In other words, false evidence passes the indicated threshold if there is a "reasonable probability" that, had it not been introduced, the result would have been different.' [Citation.] 'The requisite "reasonable probability"' is 'determined objectively,' is 'dependent on the totality of the relevant circumstances,' and must undermine[] the reviewing court's confidence in the outcome.'" (In re Cox (2003) 30 Cal.4th 974, 1008-1009.)

Petitioner raises the same claims here that were previously raised and determined at the hearing on the order to show cause in Stanislaus Superior Court. He argues that Ybarra had a much more extensive history as an informant for law enforcement than the prosecution revealed at trial. He claims this information would have been material and favorable to the defense because having a pattern of serving as an informant before and after the murder would make it likely that Ybarra served as an informant in this case as well. Next, petitioner argues that evidence was withheld that

showed Ybarra did not serve his 240-day jail sentence, but served only four days. Petitioner asserts this information would have refuted the prosecution's claim that Ybarra did not receive any deals or leniency for testifying. The third item petitioner claims the People failed to disclose was that Ybarra received monetary payments from the prosecution in 1988, contrary to the testimony at trial by Fontes. Again, it is argued that this evidence would have been material and favorable to the defense by showing that Ybarra did receive favors or benefits for testifying for the prosecution.

"The 'petitioner in a habeas corpus proceeding has the burden not only of alleging but also proving the facts on which he relies in support of his claim for relief.'" (In re Pratt (1980) 112 Cal.App.3d 795, 862.) "[W]here the superior court has denied habeas corpus after an evidentiary hearing and a petition for habeas corpus is thereafter presented to an appellate court based upon the transcript of the evidentiary hearing conducted in the superior court" (In re Wright (1978) 78 Cal.App.3d 788, 801-802), the rules applicable to our review are the same as where we have appointed a referee to conduct an evidentiary hearing. These rules are well settled. "[T]he appellate court is not bound by the factual determinations of the referee but, rather, independently evaluates the evidence and makes its own factual determinations; the factual determinations of the referee are entitled to great weight, however, when supported by the record, particularly with respect to questions of or depending upon the credibility of witnesses the referee heard and observed." (Id. at p. 801.) "When a reference is made by a Court of Appeal, the referee appointed is customarily a judge of the superior court and, of course, the opportunity to hear and observe the witnesses is the same whether the judge is acting as a referee appointed by the appellate court or as a judge of the superior court." (Ibid.)

Petitioner asserts that we should not give deference to the superior court ruling because it failed to consider critical and uncontroverted facts and failed to consider the applicable law in establishing the materiality of the constitutional violations.

First, petitioner claims the superior court erred when it stated that petitioner does not have any direct evidence to show that Berrett, Fontes and Ybarra testified falsely by claiming that Ybarra served his full jail sentence. Petitioner claims the evidence he presented at the hearing established that Ybarra served only four days in jail and that his early release from jail was covered up. At petitioner's trial the testimony was that Ybarra's sentence for the theft conviction was served out of the county and under an assumed name. In addition, Fontes testified that for the theft conviction Ybarra received probation and county jail time. "He served eight months. I believe he went in December and got out in May and he was on a total of three years probation." In its ruling on the order to show cause the court failed to note this testimony from trial, but its omission from the court's ruling does not benefit petitioner; it establishes there was no cover up at trial and that Ybarra served his sentence in a different county jail.

While Fontes testified at trial that Ybarra served eight months, he described the eight months as a term from December to May. Thus the length of the sentence was not covered up at trial. We are confident that jurors were capable of calculating that December to May is not eight

months. In addition, the fact that Ybarra's probation conditions required him to report to his probation officer within 14 days of his release from jail, combined with the probation officer's report that states he reported on June 6, 1989, to sign the terms of his probation following the release from jail, is strong evidence that Ybarra served his sentence as described by Fontes and upon his release reported to the probation department within 14 days. Also, it is clear that Ybarra sought money from Fontes on a weekly basis beginning in December of 1988 but after he went to jail there is no evidence Ybarra received any money until May or June, which would have coincided with his release from jail.

Petitioner claims the critical evidence not looked at by the superior court was the June 6, 1989, probation officer's report stating that Fontes explained Ybarra was released early from jail due to being in the "Victim Witness Program." Even if the court did not mention it in its ruling, the report is entirely consistent with Fontes's trial testimony that Ybarra received an eight-month sentence for the theft conviction, that he served it out of county, and that he served his sentence from December to May.

The fact that the Stanislaus documents show that Ybarra served only a few days in Stanislaus County does not demonstrate that there was false testimony at trial. The documents merely reinforce the evidence that Ybarra served his sentence out of the county and under a different name.

In addition, petitioner claims the court's ruling is factually inaccurate when it states that Ybarra testified at trial that he served his full sentence in Tuolumne County. Petitioner is correct that Ybarra did not testify he served his sentence in Tuolumne County; Ybarra testified he served his sentence in another county. This distinction makes no difference whatsoever.

We thus agree with the court in its ruling on the order to show cause regarding whether false testimony was given regarding the jail sentence Ybarra served for his theft conviction. We do so based on the reasons given by the trial court and for the additional reasons we previously noted.

Next, petitioner takes issue with the court's rejection of his claim that the prosecution presented false evidence of Ybarra receiving payments from the prosecution and the prosecution failed to disclose material evidence favorable to the defense on this issue. At trial Fontes testified two times that Ybarra was not given any money prior to entering the witness protection program. On both occasions this testimony occurred during questioning regarding the witness protection program. In addition, the documents discovered after trial indicate that the money given to Ybarra was asked for in connection with the Padilla case and was merely witness expense money. In any event, even if the testimony of Ybarra and Fontes is characterized as false and the documents showing the payments were suppressed by the prosecution, petitioner has not shown that this evidence had any significant effect on the outcome. Fontes testified at trial that Ybarra received $ 7,000 through the witness protection program. In fact, Fontes actually went and purchased groceries for Ybarra using some of the money and personally paid Ybarra's bills. In addition, Fontes arranged for Ybarra to be housed in a different county to serve his jail sentence, obtained a new identity for him, arranged for Ybarra to be placed in a single cell and then released from jail when he

was arrested after his release from jail on the theft conviction, and accompanied Ybarra to the probation department a couple of times. It was clear from all of this evidence at trial that Ybarra was being carefully monitored and his needs were being met under the watchful eye of Fontes. The jury would not have been influenced if it had learned that Ybarra received an additional sum of merely $ 310 after the murder and before serving his sentence for the theft conviction. We agree with the court's determination that the presentation of false testimony, if any, and suppression of evidence regarding payments made to Ybarra by the People was insignificant and would have not affected petitioner's jury trial if presented at trial.

The last area raised by petitioner as affecting the verdict relates to the documents showing that Ybarra was an informant prior to 1984 and Ybarra's testimony regarding his informant activities. Ybarra admitted to being an informant. He admitted that he asked for protective custody when he was in jail because he was an informant. He testified that he could not go to the Lawson house to buy drugs because they knew he was an informant. When questioned by petitioner's counsel, the questions regarding his informant activity were in the context of 1984 and his activities at that time. At trial Ybarra was asked if he acted as an informant as a result of his arrest for the theft that resulted in his theft conviction. He said he was not an informant at that time. Petitioner characterizes this as testimony from Ybarra denying any other informant activity. We do not read the testimony as such and do not find that Ybarra gave false testimony.

Even if it could be concluded that Ybarra gave false testimony or the People suppressed evidence regarding some of his informant activity, petitioner again has not shown that this evidence would have changed the outcome of his trial in any significant way. The jury was aware that Ybarra had previously acted as an informant on more than one occasion, that he continued to ask for protective custody because of his informant activities, and that the people in the Lawson house characterized him as an informant and treated him as such. In addition, the jury was aware that Ybarra was a drug addict, thief, and convicted felon. The additional evidence was not shown to be any different in kind than the evidence already before the jury.

In re Hernandez, 2010 Cal. App. Unpub. LEXIS 2551, 1-40 (Cal. App. 5th Dist. Apr. 8, 2010).

### 2.    Legal Standard

Due process requires that the prosecution disclose exculpatory evidence within its possession. Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); Towery v. Schriro, 641 F.3d 300, 309 (9th Cir. 2010). There are three components of a Brady violation: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence

must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Banks v. Dretke, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004). Evidence is "favorable to the accused" for Brady purposes if it is either exculpatory or impeaching. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). If information would be "advantageous" to the defendant, Banks v. Dretke, 540 U.S. 668, 691, or "would tend to call the government's case into doubt," Milke v. Ryan, 711 F.3d 998, 1012 (9th Cir. 2013), it is favorable. Comstock v. Humphries, 786 F.3d 701, 708 (9th Cir. 2015).

Evidence is "suppressed" where it is known to the State and not disclosed to the defendant. Strickler, 527 U.S. at 282. The State's duty to disclose is affirmative; it applies "even though there has been no request by the accused." Id. at 280 (citing United States v. Agurs, 427 U.S. 97, 107 (1976)). To satisfy its duty, the State must disclose evidence known to the prosecutor as well as evidence "'known only to police investigators and not to the prosecutor.'" Id. at 280-81 (citing Kyles v. Whitley, 514 U.S. 419, 438 (1995)). Thus, the prosecutor has an obligation "to learn of any favorable evidence known to the others acting on the government's behalf in [the] case, including the police." Id. at 281 (citing Kyles, 514 U.S. at 437). Once the prosecutor acquires favorable information, even if she "inadvertently" fails to communicate it to the defendant, evidence has been suppressed. Id. at 282; Comstock, 786 F.3d at 709.

The suppression of favorable evidence is prejudicial if that evidence was "material" for Brady purposes. Strickler, 527 U.S. at 282. Evidence is "material" if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 290 (citing Kyles, 514 U.S. at 435). To establish materiality, a defendant need not demonstrate "that disclosure of the suppressed evidence would have resulted ultimately in [his] acquittal." Kyles, 514 U.S. at 434. Rather, the defendant need only establish "a 'reasonable probability' of a different result." Id. (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). A "reasonable probability" exists if "the government's evidentiary suppression 'undermines confidence

in the outcome of the trial.'" <u>Id.</u> (quoting <u>Bagley</u>, 473 U.S. at 678); <u>see also</u> <u>United States</u> <u>v. Sedaghaty</u>, 728 F.3d 885, 900 (9th Cir. 2013) ("In evaluating materiality, we focus on whether the withholding of the evidence undermines our trust in the fairness of the trial and the resulting verdict.").

While not explicitly stated or conceded by the parties, only the third prong of the <u>Brady</u> analysis is at issue in the present dispute. Records relevant to the impeachment of Ybarra, a key witness at Petitioner's trial, were not provided until over a decade after trial. Respondent does not dispute that the documents were not provided.

### 3. The Parties' Arguments

This claim is based solely on the discovery of additional records relating to Ybarra and provided to Petitioner after his trial. Plaintiff contends that the documents reveal more extensive informant activity and that Ybarra received additional special favors and benefits from law enforcement. Petitioner contends that the additional evidence directly reflected on the nature of Ybarra's relationship with law enforcement and would influence the jury's determination of his truthfulness.

Plaintiff admits that some evidence of Ybarra role as an informant, including compensation from law enforcement was disclosed at trial. However, Petitioner asserts that the additional documents would have further impeached Ybarra's testimony and the lack of that evidence undermined confidence in the outcome of the trial.

Specifically, Petitioner contends that the prosecution failed to disclose three areas of evidence that would impeach Ybarra's testimony. First, new documents disclosed that Ybarra had a much more extensive history as an informant in at least 13 separate cases starting in 1981. Second, Petitioner contends that the new evidence shows that Ybarra was provided direct cash payments and additional undisclosed benefits while Petitioner's case was pending. This included evidence that district attorney investigator Fontes intervened in support of Ybarra in his dealings with other law enforcement officers regarding his criminal activity. Finally, Petitioner contends that the new documents show that Ybarra only served several days of a theft conviction, when evidence was presented

1 at Petitioner's trial that Ybarra served the entire eight month term. In light of the new

2 evidence that was disclosed, Petitioner contends that the state court's denial of his

3 Brady claim was an unreasonable determination of the facts and law.

4 Respondent admits that new documents were produced, but contends that (1) the

5 evidence does not show the extent of benefits to Ybarra claimed by Petitioner, including

6 the alleged early release from his theft sentence, and (2) that the evidence was not

7 material as there was significant evidence at trial of Ybarra's status as an informant that

8 already placed his credibility at issue. Accordingly, Respondent argues that the state

9 court's denial of the claim was not unreasonable.

10 For clarity, each category of evidence will be discussed independently. Following

11 will be an analysis of the cumulative impact of all of the discovery and whether the state

12 court's decision was reasonable in light of the evidence presented.

### 4.     Informant-Law Enforcement History

14 Petitioner claims that the state failed to provide documentation and evidence that

15 Ybarra's history as an informant for law enforcement was much more extensive than

16 revealed at trial. Had it been provided, Petitioner contends, Ybarra's credibility could

17 have been subject to further impeachment.

### a.     History Disclosed at Trial

19 At trial, Ybarra admitted that he became an informant for the county drug

20 enforcement unit in 1984. (Rep. Tr., Vol. XII at 1688-90.) At the time he became an

21 informant felony burglary charges were pending against him, and they were dropped in

22 exchange for his informant activity. (Id.) Ybarra thought he would have to serve time in

23 jail for a burglary charge prior to the charges being dropped. (Id.) Ybarra further

24 explained that he was told by law enforcement that he needed to work up five cases to

25 get his charges dismissed. (Rep. Tr., Vol. XXIII   at 1784-86.) He ultimately provided

26 information in seven cases; he did so because he was provided money that he was able

27 to spend on his drug habit. (Id.)

28 Ybarra also admitted when providing testimony at Petitioner's trial in January

1990 that he had charges pending for shoplifting in September, 1990.  (Rep. Tr., Vol. XIII

at 1781-2.) He stated that he was provided immunity when testifying at an earlier trial

against one of Petitioner's co-defendants. (Id. at 1782-85.) However, when questioned

whether he received any deals for the testimony provided at Petitioner's trial, Ybarra

denied that he was provided any assistance, and stated that "I didn't even know that

they were recording me, you know. I thought that I wouldn't be subpoenaed. I just

thought that I was letting them know that they had the right man. That was it." (Rep.Tr.,

Vol. XIII, at 1849.)

### b.    Undisclosed History

The state court, in its decision, discussed the evidence that was disclosed to

Petitioner after trial and relevant evidence presented at an evidentiary hearing

discussing that new evidence. The Court will briefly summarize the new evidence.

Documents establish that Ybarra acted as a confidential informant beginning in

1981, not 1984 as he testified at trial. (Pet., Ex. K.) A document states that in 1981,

Ybarra agreed to work for money and, although undated, he initialed and signed a

confidential waiver to perform informant work for the Stanislaus County Drug

Enforcement Unit.  Documents also show that Ybarra acted as an informant in a drug

case in February of 1988, after the Alvarado murder, but prior to Ybarra testifying at any

of the trials relating to the murder. (Pet., Ex. L.)

When Ybarra was arrested in December of 1992 it was noted on his intake

worksheet that it was believed that Ybarra is an "old 300" who "burned every chance he

was given." A "300" is a term given to an informant. (Pet., Ex. M.)

At the evidentiary hearing, Ybarra acknowledged, and newly disclosed exhibits

confirmed, that he had been an informant in 1981, 1982, 1984, and also in 1988 after the

murder. (ECF No. 50-52.)

### c.    State Court Decision Not Unreasonable

The state court focused solely on the prejudice prong of the Brady claim with

regard to the additional informant activity. Accordingly, the Court, for purposes of this

analysis will assume that the evidence was favorable impeachment evidence and that the state suppressed the evidence at trial.

The California Appellate Court, in the last reasoned decision denying this claim, provided the following reasoning.

> The last area raised by petitioner as affecting the verdict relates to the documents showing that Ybarra was an informant prior to 1984 and Ybarra's testimony regarding his informant activities. Ybarra admitted to being an informant. He admitted that he asked for protective custody when he was in jail because he was an informant. He testified that he could not go to the Lawson house to buy drugs because they knew he was an informant. When questioned by petitioner's counsel, the questions regarding his informant activity were in the context of 1984 and his activities at that time. At trial Ybarra was asked if he acted as an informant as a result of his arrest for the theft that resulted in his theft conviction. He said he was not an informant at that time. Petitioner characterizes this as testimony from Ybarra denying any other informant activity. We do not read the testimony as such and do not find that Ybarra gave false testimony.
>
> Even if it could be concluded that Ybarra gave false testimony or the People suppressed evidence regarding some of his informant activity, petitioner again has not shown that this evidence would have changed the outcome of his trial in any significant way. The jury was aware that Ybarra had previously acted as an informant on more than one occasion, that he continued to ask for protective custody because of his informant activities, and that the people in the Lawson house characterized him as an informant and treated him as such. In addition, the jury was aware that Ybarra was a drug addict, thief, and convicted felon. The additional evidence was not shown to be any different in kind than the evidence already before the jury.

In re Hernandez, 2010 Cal. App. Unpub. LEXIS 2551 at 37-40.

The state court's ruling regarding the lack of prejudice from the suppressed evidence of Ybarra's additional informant activity, when reviewed under the deferential standards of AEDPA, was reasonable. Evidence is "material" under Brady if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290 (citing Kyles, 514 U.S. at 435). Materiality is established if there is a reasonable probability of a different result and undermines confidence in the outcome of the trial." Id.

The additional evidence of Ybarra's informant activity would undoubtedly have provided additional impeachment evidence. But, the state court's determination that

there was already significant evidence of Ybarra's informant activity used to impeach Ybarra's credibility is a reasonable and logical conclusion. The court reiterated how the jury was made aware of the fact that Ybarra acted as an informant in many cases in 1984 alone, that he was a known informant and not welcome at the Lawson house, and that he received protective custody when jailed due to safety concerns based on his informant status.

The state court's determination that the additional evidence was not material and that the failure to disclose it did not place undermine confidence of the verdict was not an unreasonable application of Federal law or an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). While there was additional evidence of Ybarra's prior informant activity that was not disclosed at trial, Petitioner was aware of, and presented strong impeachment evidence against Ybarra based on his informant activities known at trial. The jury was made aware of Ybarra's past informant activity, for which he was compensated, and that Ybarra was provided thousands of dollars in benefits, albeit indirectly, to assist and protect him prior to testifying against Petitioner. While the undisclosed informant activity would have been favorable impeachment evidence for Petitioner to rely upon at trial, the state court was reasonable in determining that the impact on the jury of the additional informant activity would be greatly diminished by the significant evidence previously presented. Defense counsel was able to, and did, present impeachment evidence undermining the credibility of Ybarra at trial. While the undisclosed evidence would have further supported defense counsel's arguments, Petitioner has not shown that the state court was unreasonable in finding that undisclosed information did result in prejudice. Strickler, 527 U.S. at 290 (citing Kyles, 514 U.S. at 435).

Furthermore, there was corroborating evidence unrelated to Ybarra's testimony that implicated Petitioner in the murder. Ybarra testified that he saw Petitioner pick up Alvarado from Guzman's Bar after having the conversation with Padilla and Prado about killing her. But there was also testimony from Lorenzo Guzman, the owner of Guzman's

bar, regarding Alvarado leaving the bar on the night of the murder. While Guzman did not identify Petitioner, he testified that he saw Alvarado enter the passenger side of an Oldsmobile car. Later that night police detectives found Petitioner's Oldsmobile at his sister's house with mud on the left side of the car and on the gas pedal. There was a box of .22 caliber cartridges on the dash, one .22 caliber bullet on the floor, and a spent .22 caliber casing under the seat. Two shotgun shell casings were on the ground near the car. An expert later testified that the .22 caliber bullet found in Alvarado had the same copper wash and design of the bullets in the Winchester cartridges found in the car. Months later a sawed-off shotgun was found in co-defendant Prado's possession. A criminalist found that the shells near the car were likely fired by shotgun as well as the slug found in Alvarado's body. A fingerprint was recovered from the passenger-side window of the car matching Alvarado's right middle finger. Finally, pictures from the crime scene purportedly indicated scratch marks in the mud next to Alvarado's body spelling Petitioner's name 'Jesse' implicating that Alvarado wrote down the name of her murderer in the mud before she expired.

There was a significant amount of additional physical and testimonial evidence to support finding Petitioner guilty of Alvarado's murder. The additional impeachment evidence of Ybarra would not have changed the influence of Guzman's testimony or the effect of the physical evidence presented relating to the car or firearms used in the murder. When viewed cumulatively, Ybarra's testimony was a significant portion of the prosecution's case, but it was not the only evidence supporting the conviction. Based on the additional evidence supporting Petitioner's guilt, the impeachment of Ybarra would have even less impact on the result of the trial. It is not possible to determine from the guilty verdict alone whether the jury found Ybarra to be perfectly credible. While the additional informant activity would have further impeached Ybarra, and could have impacted the jury's determination, the state court was reasonable in finding it was not reasonably probable that the new evidence would have affected the verdict. As such, the state court's finding that the additional impeachment evidence of Ybarra based on his

past informant activity was not material under <u>Brady</u> was reasonable.

Accordingly, the state court's determination was not objectively unreasonable and "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>White v. Woodall</u>, 134 S. Ct. 1697, 1702 (2014) (citing <u>Harrington v. Richter</u>, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624, 641 (2011)). The prosecution failed to disclose additional evidence of Ybarra's informant activity. However, the state court's finding that the evidence was not material under <u>Brady</u> was not an unreasonable application of Federal law.

## 5. Law Enforcement Benefits Provided to Informant

### a. Benefits Disclosed at Trial

At trial, Fontes admitted that in the spring of 1989, after Ybarra served his theft sentence and testified against Padilla regarding the Alvarado murder, he assisted Ybarra in obtaining financial consideration through the witness protection program. (Rep. Tr. Vol. XXII at 2943-46.) Fontes testified that after Ybarra was released from an eight month jail sentence in May 1989, Ybarra was physically threatened and injured by his brother, and Fontes helped put an application together to place Ybarra under protection. (<u>Id.</u>)

While Ybarra received benefits including funds through the witness protection program, Fontes testified that no money was directly provided to Ybarra. (<u>Id.</u> at 2948, 2993.) Ybarra was provided housing, groceries, supplies, utilities, and incidentals each month for roughly 11 months from June 1989 until May 1990. (Rep. Tr. at 2949-50). The benefits totaled around $7,000. (<u>Id.</u>) However, late during his testimony Fontes explained that Ybarra was provided $75 in cash each month to pay for incidentals, "such as haircuts, newspaper and laundry." (<u>Id.</u>) Fontes admitted that in total, Ybarra was provided $750 in cash. (<u>Id.</u>)

Fontes testified that he never did anything to get charges dropped or lessened for Ybarra. (Rep. Tr. at 2952-53.) However, Fontes did remember one instance where after a probation violation, Ybarra was jailed on a case that had been resolved. (<u>Id.</u>) Fontes

contacted the jail to place Ybarra in a single cell for his safety and later contacted a judge who ordered Ybarra be released to Fontes until the next day when the charges could be dismissed. (Id.)

District Attorney Barrett testified that Ybarra's agreement to be a prosecution witness in Petitioner's case did not result in a written informant contract. (Rep. Tr., Vol. XXI at 2913.)

### b. Undisclosed Benefits

Petitioner provided several exhibits based on the newly provided documents to attempt to establish that Ybarra was provided undisclosed benefits. An "adult court worksheet" prepared in June of 1991 stated that nothing should be in Ybarra's probation report to indicate that he was a witness in the Padilla or Hernandez murder cases. (Pet., Ex. D.)

A probation officer's report dated January 7, 1991, indicated that Ybarra had been arrested and that he told the probation officer that Fontes was working on his new offense, but Ybarra did not know if Fontes was going to make a deal with the police for him. (Pet., Ex. I.)

Further, a series of memorandums and receipts indicate that Ybarra received benefits from testifying at the Padilla trial in late 1988 (i.e., prior to providing testimony at Padilla or Petitioner's trial, and prior to being enrolled in the witness protection program). In one memo, dated November 28, 1988, Fontes requested $60 to give to Ybarra to allow him to leave the area. (See ECF No. 54-1 at 24.)

Fontes requested $150 for Ybarra in another memorandum dated December 8, 1988. (Id. at 25.) Fontes notes that Ybarra "has asked us for some help in paying some of his living expenses." Fonts explained that if the district attorney's office had to pay to keep Ybarra in a hotel and pay for his meals it would probably cost $75 a day. Ybarra was coming into the district attorney's office that day to go over testimony, and Fontes stated that "[h]e will want some money at that time." (Id.)

Fontes explained that he expected Ybarra to be back each week for money and

wondered if he would need to write memos each week or could have the payments all approved at once:

> I think we can get by with giving him about $50.00 this week. I anticipate that he will be back each week for more money until he has to testify.

> Due to the fact that we don't have a case against Padilla without him, I feel we should spend the money for his expenses.

> I don't know if you want me to write a new memo each time he asks for money or if you want to make one check out for about $150.00 and to have me give it out to him $50.00 at a time, the choice is yours.

(Pet., Ex J.[3])

On the same date, handwritten notes on the memo approved the request and stated that a new memo would be required for any new check in excess of the $150 advanced on December 8, 1988. (See ECF No. 54-1 at 25.)

Later that month, in a memo dated December 22, 1988, Fontes explains "We have given Ybarra money in the past to assist him with is living expenses while he has been waiting to testify. He was last given $100.00 on Dec. 15th, one week ago. He has asked for additional money to carry him through until next week." (See ECF No. 54-1 at 28.) After noting that Ybarra must appear for his sentencing in his theft case in less than a week, on December 28, 1988, Fontes requested that he "would like to get a check in the amount of $100.00 to give to him to get him through next week. I would like the check made out to me and I will cash the check and give him the money in two installments." (Id.) Written notes on the memo approved a $60 first installment. (Id.)

### c. State Court Decision Not Unreasonable

Like the claims relating to the undisclosed informant activity, the state court also found that the failure to disclose some of the benefits to Ybarra were not prejudicial under Brady. The state court concluded that in light of the evidence presented at trial including over $7,000 in benefits provided to Ybarra along with the personal efforts of

---

[3] The electronic copy of the third memorandum and all the receipts attached to this exhibit are dark and nearly illegible. Better copies of the documents are attached to the lodged copy of Petitioner's petition for writ of habeas corpus filed with the California Supreme Court. (See ECF No. 54-1.)

Fontes to secure him housing and groceries, that "[t]he jury would not have been influenced if it had learned that Ybarra received an additional sum of merely $310 after the murder and before serving his sentence for the theft conviction." (ECF No. 1-7 at 106.) It concluded, "that the presentation of false testimony, if any, and suppression of evidence regarding payments made to Ybarra by the people was insignificant and would have not affected petitioner's jury trial if presented at trial." (Id.)

Petitioner argues that unlike the thousands of dollars in compensation provided to Ybarra in the witness protection program after the Padilla trial, the state court's decision was unreasonable because the money provided to Ybarra was done so prior to his need for protection and therefore only based on his status as witness for the prosecution. (Pet., ECF No. 1-1 at 75-76.) Petitioner is correct that the payments were not disclosed at trial.

The testimony at the evidentiary hearing indicates that the payments totaling $310 to Ybarra in 1988 were not previously disclosed as required under Brady. Had the state court found otherwise, it would have been an unreasonable application of the facts. But it did not. The state court assumed that the additional payments were not disclosed and found the failure to disclosure did not prejudice Petitioner. (ECF No. 1-7 at 106; "The jury would not have been influenced if it had learned that Ybarra received an additional sum of merely $310 after the murder and before serving his sentence for the theft conviction.") Viewed through the deferential lens of AEDPA, the state court decision was reasonable. While there were undisclosed payments to Ybarra, there was significant impeachment evidence presented regarding his prior informant work in which he was provided compensation, and the benefits he received through the witness protection program the year before providing his testimony against Petitioner.

Petitioner argues that although evidence was presented at trial of benefits paid to Ybarra both before and after the undisclosed payments in 1988, the undisclosed payments were nevertheless prejudicial as they were directly related to his cooperation in testifying against Petitioner and his co-defendants, rather than for prior informant work

or provided under the auspices of providing his safety through the witness protection program.

Petitioner's argument is sound. The undisclosed payments would have further impeached Ybarra and could have influenced the verdict. However, Petitioner has not shown that the state court was unreasonable in finding that the evidence was effectively cumulative and not reasonably probable that it affected the decision of the jury. The payments, amounting to several hundred dollars, are significantly smaller than the more than seven thousand dollars-worth of benefits provided to Ybarra that were disclosed at trial. Based on the significant evidence of benefits disclosed at trial, the other evidence indicating Petitioner's involvement in the murder, and the deferential standard under AEDPA, the Court finds that the state court's determination that the undisclosed benefits provided Ybarra were not material under Brady was a reasonable factual and legal determination. Petitioner is not entitled to relief under this claim.

### 6. Informant's Early Release from Jail

#### a. Description of Sentence at Trial

Fontes testified at trial that in December 1988 Ybarra plead guilty and received an eight month jail term. (Rep. Tr. at 2970.) He recalled that Ybarra was in jail from December 1988 to May 1989 serving the jail term. (Id.) However, he did not mention anything about serving the sentence in a different county. District attorney Barrett testified that the only concession she made for Ybarra was to ask the jail to allow Ybarra to serve his eight month sentence out of county. (Rep. Tr., Vol. XXI at 2904.) Ybarra also testified that he served an eight month sentence in 1988. (Rep. Tr., Vol XI, at 1615.)

Additionally, James Ligon, a custodian of records for the Stanislaus County Jail testified at trial. (Rep. Tr., Vol. XXII at 2999-3043.) His testimony indicated that Ybarra was arrested on December 27, 1988 for petty theft with a prior jail term, and sentenced to 240 days in jail. (Id. at 3013-3015, 3032-33.) When asked if Ybarra served his 240 day sentence, Ligon did not know. (Id.) Ligon noted that the jail records he reviewed indicated that Ybarra was released on December 30, 1988. (Id. at 3014.) Ligon further

noted that there may be information regarding Ybarra serving the rest of the sentence in another jail facility on another document; however, the line of questioning shifted, and Ligon neither provided information nor was another document provided describing Ybarra's possible transfer to another institution.[4] (Id.)

### b. Undisclosed Documents Regarding Informant's Custody

Several documents were produced reflecting that Ybarra was arrested on December 27, 1988, and released (as opposed to transferred to a different county) on December 30, 1988. A handwritten note from the probation department stated that Ybarra was released on December 30, 1988. (Pet., Ex. A, ECF No. 1-3.) A June 6, 1989, probation report stated that Ybarra was accompanied to the meeting by Alan Fontes, and that Fontes explained that Ybarra was released early from jail because he was in the "victim witness" program regarding a murder case. (Pet., Ex. B.) A probation department memo dated April 3, 1990, addressed to a "court officer" stated that Ybarra was released on December 30, 1988, through the Witness Assistance Program, but that should not be stated in open court, only in chambers if requested. (Pet., Ex. C.)

A "Stanislaus County probation adult court action sheet" has an entry from December 27, 1988, stating: "36 Months Formal Probation; 240 Days County Jail 15 Days Credit For Time Served 7 days Credit for Good & Work" and that his release date was December 30, 1988. (Ex. E.)

In a supplemental probation officer's report filed April 11, 1990, the probation officer recommends that Ybarra's probation be revoked due to his dirty drug test. The report stated that one of the conditions of Ybarra's December 27, 1988, grant of probation was that he report in person to the probation officer within 14 days from his date of release from custody and that Ybarra reported on June 6, 1989. Under the

---

[4] While Ligon's testimony was not discussed in the state court decision or the briefing "Federal courts sitting in habeas may consider the entire state-court record, not merely those materials that were presented to state appellate courts." McDaniels v. Kirkland, 813 F.3d 770, 780-781 (9th Cir. 2015) (citing Jamerson v. Runnels, 713 F.3d 1218, 1226 (9th Cir. 2013). "Pinholster's concerns are not implicated when a federal habeas court is asked to consider evidence that was presented to the state trial court, whether or not that evidence was subsequently presented to a state appellate court." Id.

section of the report listing incarceration information, the report states that Ybarra was committed on December 27, 1988 and released on December 30, 1988. (Exhibit N.) Ybarra's probation was revoked on June 11, 1990, and he was given credit for time served of 25 days. (Exhibit O.)

On June 12, 1991, after the trial was completed in Petitioner's case, Ybarra's probation was once again revoked on the theft case and he was sent to prison for that theft (1988) and two additional thefts committed in 1990 and 1991. He was given credit for time served of 59 days. (Exhibits P & Q.)

### c.    State Court Decision Not Unreasonable

With regard to this issue, the state court made a factual finding that the evidence indicated that Ybarra served his sentence in a different county. Having found that the evidence did not support the conclusion that Ybarra was released early, the Court held there was no false evidence presented and therefore no violation of Brady.

Unlike the other two categories of undisclosed evidence reviewed to determine whether the failure to disclose was material, here the Court must determine the reasonableness of the state court's factual determination that the evidence supported the finding that Ybarra had served the remainder of his term out of county.

In reaching its factual determination, the state court noted that Fontes testified at trial that Ybarra served the sentence from December to May, a period shorter than eight months.[5] The state court therefore found that the prosecution provided accurate evidence at trial that Ybarra was incarcerated for several months less than the actual eight month sentence. The state court also found the fact that Ybarra was to meet with his probation officer within fourteen days of release from jail, and records indicated that he reported on June 6, 1989 was "strong" evidence that he served his sentence. The state court found that the timing of release in May coincided with when Ybarra began receiving compensation under the witness protection program from the prosecution.

_____
[5] Ybarra testified that the length of the sentence was reduced based on the standard application of good and work time credits.

1    Finally, the state court found that that Stanislaus County records indicating Ybarra did

2    not serve his sentence there reinforced the argument that he served it out of county.

3        However, in determining that Ybarra served the sentence out of county rather

4    than being released, the state court failed to discuss several relevant factual

5    discrepancies. Several documents newly revealed in discovery were not analyzed in the

6    state court order. The state court listed as evidence the probation memo dated April 3,

7    1990, stating Ybarra was released on December 30, 1988, but that that should not be

8    mentioned in open court, only in chambers. The state court did not address why such

9    notes would not be made public at trial. There may have been a need to keep Ybarra's

10   location secret for his safety while he was in custody, but it is unclear why there was a

11   need to keep his release secret over a year afterwards. Court and probation records

12   from 1990 stated that Ybarra only spent 19, 25, or 59 days in custody, respectively,

13   rather than the eight month sentence alleged. Again, the state court did not address

14   discrepancies in Ybarra's custody credit calculation in its order.

15       The state court did not mention the absence of jail records from Tuolumne County

16   Jail regarding Ybarra or orders transporting him from Tuolumne County to testify during

17   the Padilla trial. Ybarra also mentions being involved in a work release program while in

18   custody in Tuolumne County, but no records were provided in support of his testimony.

19       The state court did not discuss Ybarra's testimony, at the evidentiary hearing, that

20   he was transported from his father's house, rather than Tuolumne County jail, to testify in

21   the Padilla trial. The state court also ignored Ybarra' testimony that the he lied to

22   Petitioner's counsel during an interview shortly before the evidentiary hearing when he

23   told him that he had been released from custody, not transported to another jail, with

24   regard to his theft conviction.

25       Under § 2254(d)(2), fact-based challenges "fall into two main categories." Hibbler

26   v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). "First, a petitioner may challenge the

27   substance of the state court's findings and attempt to show that those findings were not

28   supported by substantial evidence in the state court record." Loher v. Thomas, 825 F.3d

1103, 1112 (9th Cir. 2016) (citing Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004)). "Second, a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way." Id. (citing Taylor, 366 F.3d at 999, 1001). It does not appear that Petitioner presents a challenge to the fact-finding process.

A state-court decision "will not be overturned on factual grounds unless *objectively* unreasonable in light of the evidence presented in the state-court proceeding." Id. (citing Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (emphasis added). "While not impossible to meet, that is a daunting standard—one that will be satisfied in relatively few cases, especially because we must be particularly deferential to our state-court colleagues." Id. (citation omitted.) Thus, a "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Loher, 825 F.3d at 1112; Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 175 L. Ed. 2d 738 (2010).

Whereas here, the claim was adjudicated, it is appropriate to consider that the state court was aware of all of the evidence presented to the court, and denied the claim despite failing to address pertinent facts and arguments presented by Petitioner. See Harrington v. Richter, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated.").

Despite its failure to mention all of the factual arguments supporting Petitioner's claim, the state court was reasonable in finding that Ybarra served his theft sentence out of county and that there was a failure to disclose facts regarding the benefits that Ybarra received. When viewing a culmination of the evidence, the state court was not unreasonable in determining that it supported a finding that Ybarra served the theft sentence in Tuolumne County.

42

Some of the evidence presented was not particularly favorable to Petitioner, and its omission from the state court's denial of his Brady claim had little impact. The state court failed to address Ybarra's testimony. Ybarra changed his story regarding serving his theft sentence. After telling Petitioner's counsel that he did not serve the theft sentence, he explained that he lied to Petitioner's counsel, and that he really did serve the sentence. Based on his testimony, it would have been reasonable for the state court to have discounted his testimony as unreliable. Ybarra was either lying to Petitioner's counsel when he stated he was released early or he lied in his testimony in open court where he instead testified that he was transferred and served his sentence. Based on his acknowledged lying, his testimony was worthy of little credit. Besides ultimately testifying that he was transferred rather than released, his testimony that he was driven from his father's residence to testify at trial by Fontes was not particularly strong. Upon review of the testimony, it is possible that Ybarra was confused as to which trial he was picked up by Fontes at his father's house; it could have been for Petitioner's trial while Ybarra was out of custody.

Additionally, the state court did not specifically address all of the county jail and probation documents indicating that Ybarra was released, rather than transferred. While the state court did not elaborate, it relied on Fontes testimony at the evidentiary hearing, and it found that the documentary evidence showing Ybarra only served serval days in Stanislaus County "merely reinforced the evidence that Ybarra served his sentence out of the county and under a different name." (ECF No. 1-7 at 105.)

While the state court found that the county records supported a finding that Ybarra was transferred to Tuolumne County, Petitioner makes several opposing arguments. First, none of the documents reference "transfer"; they all state that Ybarra was released. Neither Respondent nor the state court provide any persuasive explanation as to why the custody records would be inaccurate. Further, the fact that there are no records from Tuolumne County, or for that matter, records kept in Ybarra's informant file regarding his transfer, is troubling. Unfortunately for Petitioner, the absence

of records means there is lack of evidence, and does not necessarily prove Petitioner's arguments. Petitioner attempts to argue that based on California state evidentiary statutes, this Court must presume the correctness of the county records and shift the evidentiary burden to Respondent to prove that Ybarra was transferred. However, he has provided no legal support for that argument. (See Reply at 51-60.)

Upon Federal habeas review, this Court is not concerned with violations or misconstruction of state evidentiary laws. The Court is only to determine whether the state court's determination of Federal law or determination of the facts was unreasonable. 28 U.S.C. § 2254(d). The state court, in the last reasoned decision, found Fontes testimony to be credible, and inferred from the timing of Ybarra's requests for consideration and his first meeting with his probation officer, that Ybarra was transferred and served his sentence in another county until roughly May 1989. In reaching this determination, the state court did take into consideration Ybarra's incarceration records, and found that the "documents merely reinforce the evidence that Ybarra served his sentence out of the county and under a different name." (ECF No. 1-7 at 105.) Even if the state court decision runs afoul of state evidentiary standards, its factual determination was reasonable. Reasonable jurists could disagree as to Ybarra's custody, but, given the evidence that Ybarra reported in June 1989 to sign the terms of his probation, there was a sufficiently strong evidentiary basis for finding that Petitioner served his theft sentence out of county. It is true that Ybarra's criminal records all state that he was 'released' from Stanislaus County rather than 'transferred,' and that the calculation of credits for time served are confusing in not reflecting Ybarra's time in custody for the theft conviction. However, in light of the consistent testimony of district attorney Barrett at Petitioner's trial and Fontes at the evidentiary hearing -- that Ybarra was transferred to Tuolumne County to serve his sentence -- reasonable jurists could disagree as to the correctness of the state court's factual finding that Ybarra was transferred and served his sentence in Tuolumne County.

Finally, even though the state court did not address it in its last reasoned decision,

it is also relevant that Petitioner called the Stanislaus County Jail's custodians of records as a defense witness and questioned him regarding records showing Ybarra's December 30, 1988 release. Accordingly, Petitioner was aware at trial that the Stanislaus County Jail records indicated Ybarra's release after several days, and even presented the evidence to the jury at trial. It is unknown which, if any, of the county records reflecting Ybarra's release were provided to Petitioner. But the fact remains that the Petitioner knew that the records reflected Ybarra's release from Stanislaus County Jail and presented that evidence in his defense at trial. Even if documentary evidence was not disclosed, there was no prejudice to Petitioner as he had planted a seed of doubt in the jury's mind as to whether Ybarra served his sentence for his theft conviction.

Based on the evidence disclosed regarding Ybarra's theft sentence both at trial and at the evidentiary hearing, the Court finds that the state court's determination that the undisclosed evidence was not material was a reasonable factual and legal determination. Petitioner is not entitled to relief under this claim.

### B.     Claim Two: Prosecution's Presentation of False Testimony

Petitioner, in his second claim, asserts that the state presented false testimony in violation of <u>Napue v. Illinois</u>, 360 U.S. 264, 271, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). (Pet. at 75-80, ECF No. 1-1.)

### 1.     State Court Decision

Petitioner first presented this claim by way of a petition for writ of habeas corpus with the California Court of Appeal, Fifth Appellate District on July 14, 2008. (ECF No. 53.) The court denied the petition in a reasoned decision on April 8, 2010. (ECF No. 53-10.) On August 11, 2010, Petitioner filed a petition for writ of habeas corpus with the California Supreme Court. (ECF No. 54.) On October 12, 2011, the court denied the petition without comment. (ECF No. 54-7.)

Since the Court of Appeal was the last court to issue a reasoned opinion on this issue, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.  See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991). The

state court addressed Petitioner's Brady and Napue claims simultaneously. The following excerpts of the opinion describe the standard used by the state court to decide the Napue claim:

> "Penal Code section 1473, subdivision (b)(1) provides that a writ of habeas corpus may be prosecuted if '[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration….' [P] 'False evidence is "substantially material or probative" if it is "of such significance that it may have affected the outcome," in the sense that "with reasonable probability it could have affected the outcome…." [Citation.] In other words, false evidence passes the indicated threshold if there is a "reasonable probability" that, had it not been introduced, the result would have been different.' [Citation.] 'The requisite "reasonable probability"' is 'determined objectively,' is 'dependent on the totality of the relevant circumstances,' and must undermine[] the reviewing court's confidence in the outcome.'" (In re Cox (2003) 30 Cal.4th 974, 1008-1009.)

In re Hernandez, 2010 Cal. App. Unpub. LEXIS 2551, 31-32 (Cal. App. 5th Dist. Apr. 8, 2010).

**2. Legal Standard**

**a. Federal Standard under Napue and its Progeny**

Clearly established Supreme Court precedent holds that knowingly presenting false testimony to a fact-finder necessitates reversal of a conviction if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury". Giglio v. United States, 405 U.S. 150, 153, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 271, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)); Dow v. Virga, 729 F.3d 1041, 1047-1049 (9th Cir. 2013). This is known as a Napue violation. Dow, 729 F.3d at 1047. "In addition, the state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears." Soto v. Ryan, 760 F.3d 947, 957-958 (9th Cir. 2014); Reis-Campos v. Biter, 832 F.3d 968 (9th Cir. 2016); Alcorta v. Texas, 355 U.S. 28 (1957).

The Supreme Court in Napue held that "a conviction obtained through use of false evidence, known to be such by representatives of the State", violates the Fourteenth Amendment. Napue, 360 U.S. at 269. Prosecutorial misconduct in the form of false

testimony violates the constitutional rights of the defendant and requires a reversal of the conviction if the following three elements are met: "(1) the testimony was actually false, (2) the prosecutor knew it was false, and (3) the false testimony was material (i.e., there is a reasonable likelihood that the false testimony could have affected the judgment)." Dow, 729 F.3d at 1050 (citing Napue, 360 U.S. at 271-72); see also Alcorta v. Texas, 355 U.S. 28, 31 (1957) (the state cannot allow a witness to give a material false impression of the evidence).

Although the government's knowing use of false testimony does not automatically require reversal, courts apply a less demanding materiality standard to Napue errors: whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Thus, a far lesser showing of harm is required under the Napue materiality standard than under ordinary harmless error review. See Smith v. Phillips, 455 U.S. 209, 220 n.10, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); see also Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (en banc). Napue requires courts to determine only whether the error *could* have affected the judgment of the jury, whereas ordinary harmless error review requires courts to determine whether the error *would* have done so. Dow, 729 F.3d at 1047-1049 (emphasis added).

Further, the Ninth Circuit has created a framework for reviewing Naupe and Brady violations collectively, in a manner that respects the different materiality standards for each claim. A reviewing court is to:

> [F]irst consider the Napue violations collectively and ask whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." Hayes, 399 F.3d at 985 (emphasis added). If so, habeas relief must be granted. However, if the Napue errors are not material standing alone, we consider all of the Napue and Brady violations collectively and ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different." Bagley, 473 U.S. at 682 (emphasis added) (internal quotation marks omitted); United States v. Zuno-Arce, 25 F. Supp. 2d 1087, 1117 (C.D. Cal. 1998) (applying a two-step materiality analysis to combined Brady and Napue claims), aff'd, 339 F.3d 886 (9th Cir. 2003). At both stages, we must ask whether the defendant "received . . . a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434.

Jackson v. Brown, 513 F.3d 1057, 1076 (9th Cir. 2008); Reis-Campos v. Biter, 832 F.3d 968. Accordingly, the Court will first review Petitioner's Napue claims collectively under the less burdensome 'reasonable likelihood' materiality standard, and then, if and as necessary, consider both Napue and Brady violations under the 'reasonable probability' standard.

### b. State Application of "Materiality" Standard

In the last reasoned state decision, instead of referring or citing to federal authority, the California Court of Appeal relied on California state law as set forth under California Penal Code § 1473(b)(1). That provision sets forth the materiality standard California state courts apply to false evidence violations. However, California Penal Code § 1473(b)(1) conflates the wording of the Brady and Napue materiality standards.

The California Court of Appeal explained the standard under § 1473(b)(1) as follows:

> "False evidence is substantially material or probative if it is of such significance that it may have affected the outcome, in the sense that with reasonable probability it *could* have affected the outcome In other words, false evidence passes the indicated threshold if there is a reasonable probability that, had it not been introduced, the result *would* have been different."

In re Hernandez, 2010 Cal. App. Unpub. LEXIS 2551(citations omitted; emphasis added). First, the state court explains that that false evidence need only 'may' have affected the outcome, but later clarifies that the standard requires a showing that the false evidence 'would' have resulted in a different verdict. Thus, after acknowledging the relevant standard under Napue, i.e., whether there is a "reasonable probability that the false testimony could have affected the judgment" (see Dow, 729 F.3d at 1050 (citing Napue, 360 U.S. at 271-72), the state court indicates that the standard requires a showing that there was a reasonable probability that the result *would* have been different.[6] Accordingly, it appears that the state standard, as applied by the state court,

---

[6] The state court uses the word probability rather than likelihood in reciting the Napue materiality standard. The Court finds the distinction  immaterial.

was the more stringent harmless error standard which required a showing that the false evidence would, with a reasonable probability, affect the outcome.

The Ninth Circuit in <u>Dow</u> recently found that the application of the regular harmless error standard to a false evidence <u>Naupe</u> claim resulted in a decision "contrary to" clearly established Supreme Court law under AEDPA. 28 U.S.C. § 2254(d)(1); <u>Dow</u>, 729 F.3d at 1047-1049. In <u>Dow</u>, the standard applied by the state court was whether it was "reasonably probable that a result more favorable to the defendant would have occurred." (<u>Id.</u>) That standard was found to be contrary to federal Supreme Court law. (<u>Id.</u>) There, the standard, as clarified by the state, was whether there was a "reasonable probability that, had such evidence not been introduced, the result would have been different." <u>In re Hernandez</u>, 2010 Cal. App. Unpub. LEXIS 2551at *33-35. The Court finds the standard applied here to be indistinguishable from that disapproved in <u>Dow</u>.

If there was any question of the standard to be applied under California law for false testimony violations of California Penal Code § 1473(b)(1), the California Supreme Court recently clarified. <u>See</u> <u>In re Richards</u>, 63 Cal. 4th 291, 312-313 (2016). It there stated: "[o]ur case law further explains that false evidence is material if there is a reasonable probability that, had it not been introduced, the result would have been different." <u>Id.</u> The Court further explained that the reasonable probability "is such as undermines the reviewing court's confidence in the outcome." <u>Id.</u> This reiteration of the standard is similar to that of the federal harmless error standard. <u>Strickler</u>, 527 U.S. at 282; <u>Kyles</u>, 514 U.S. at 435 (where the error is such as to place "the whole case in such a different light as to undermine confidence in the verdict."). Finally, the California Supreme Court clarifies that the "required showing of prejudice is the same as the reasonably probable test for state law error established under <u>People v. Watson</u>, 46 Cal.2d 818, 836 (1956)." <u>In re Richards</u>, 63 Cal. 4th at 312-313. The <u>Watson</u> harmless error standard is "the standard applied by California appellate courts in reviewing non-constitutional magnitude trial errors." <u>See</u> <u>Merolillo v. Yates</u>, 663 F.3d 444, 452 n4 (9th Cir. 2011).

There is no real doubt as to the standard applied in Petitioner's case. The California Court of Appeal repeatedly explained why the error affirmatively did not change the decision of the jury, rather than whether the error could have affected the outcome. (See ECF No. 1-7 at 106-107, "petitioner has not shown that this evidence had any significant effect on the outcome;" "The jury would not have been influenced if it had learned;" "the evidence … would have not affected petitioner's jury trial if presented;" and "petitioner again has not shown that this evidence would have changed the outcome of his trial in any significant way.")

Respondent presents no persuasive argument to the contrary. Respondent asserts:

> The state court recitation of the legal standards was entirely reasonable, and its examination of the evidence was plausible, even if Petitioner finds both to be less than flawless. It would needlessly cheapen that thorough state court discussion to pretend Petitioner can re-litigate the question anew in this Court.

(Answer at 23, ECF No. 58.) Respondent relies on Imbler v. Pachtman, 424 U.S. 409, 431 n.34 (1976), as authority for concluding that Petitioner's Brady and Napue claims could be combined into one claim governed by the Brady materiality standard and thus that the state court approach was reasonable. (Id. at 22-23.) That reliance is misplaced. Imbler was a civil rights case under 42 U.S.C. § 1983. It does not implicate the manner in which Supreme Court case law regarding suppressed or false evidence is to be applied in collateral appeals. In a footnote, the Supreme Court notes that there are "constitutional prohibitions against both practices," implying that the constitutional prohibitions for each claim are different. Imbler, 424 U.S. at 431 n.34.

Later Supreme Court cases have confirmed the distinction in the materiality standards. In United States v. Bagley, decided after Imbler, the Supreme Court reaffirmed the lower materiality standard for knowing use of false testimony as opposed to failure to disclose evidence:

> Our starting point is the framework for evaluating the materiality of Brady evidence established in United States v. Agurs. The Court in Agurs distinguished three situations involving the discovery, after trial, of

information favorable to the accused that had been known to the prosecution but unknown to the defense. The first situation was the prosecutor's knowing use of perjured testimony or, equivalently, the prosecutor's knowing failure to disclose that testimony used to convict the defendant was false. The Court noted the well-established rule that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S., at 103. Although this rule is stated in terms that treat the knowing use of perjured testimony as error subject to harmless-error review, it may as easily be stated as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt. The Court in Agurs justified this standard of materiality on the ground that the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves "a corruption of the truth-seeking function of the trial process." Id., at 104.

United States v. Bagley, 473 U.S. 667, 678-680 (1985) (footnotes omitted). Further, Ninth Circuit authority has reinforced the application of different materiality standards for the different claims. See Reis-Campos, 832 F.3d 968 (9th Cir. 2016).

The state court failed to apply the materiality standard for Napue claims as clearly established by the Supreme Court. A state court renders a decision "contrary to" federal law if it reaches "a conclusion opposite to that reached by [the Supreme Court] on a question of law or if [it] decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Soto v. Ryan, 760 F.3d 947, 957 (9th Cir. 2014) (citing Williams v. Taylor, 529 U.S. 362 at 413 (2000)). Having not set forth nor applied the proper federal law regarding materiality with regard to claims of false evidence, the state court's decision rests on an unreasonable application of federal law as determined by the United States Supreme Court.[7] See Dow, 729 F.3d at 1048-1049; Caliendo v. Warden, 365 F.3d 691, 698 (9th Cir. 2004) (holding that "AEDPA's presumption of correctness does not apply to state court findings arrived at through the use of erroneous legal standards").

Because the state court's application of a stricter standard than is permissible in

---

[7] Petitioner's state petitions for writ of habeas corpus repeatedly relied upon and cited to the relevant federal law with regard to his false evidence claims. (See ECF No. 52-6 at 34 (citing Giglo and Napue); ECF No. 53 at 36 (citing Napue and Agurs); ECF No. 54 (citing Napue and Agurs). Petitioner's federal false evidence claim was raised and exhausted in state court, despite the failure of the state court to address the federal standard.

the case of <u>Napue</u> error was "contrary to" clearly established Supreme Court law, the "contrary to" prong of AEDPA, § 2254(d)(1), has been satisfied. <u>Dow</u>, 729 F.3d at 1048-1049 (citing <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). Therefore, the Court must "resolve the claim without the deference AEDPA otherwise requires." <u>Crittenden v. Ayers</u>, 624 F.3d 943, 954 (9th Cir. 2010) (quoting <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007)). That is, *de novo* review is applied to Petitioner's federal constitutional claim. <u>Dow</u>, 729 F.3d at 1049.

### 3. Standard Applicable to State Court Factual Findings

As noted above, the District Judge referred this matter back to the undersigned to clarify the standard of review applicable to the state court's factual findings in light of the determination that the state court's application of law was "contrary to" clearly established Supreme Court precedent.

### a. Parties' Arguments

The parties provided supplemental briefing on this issue. (ECF Nos. 83-86.)

Petitioner acknowledges that the case law in this area is unsettled, but argues that the undersigned should review the state's factual findings de novo, either because (1) the finding of unreasonableness in the application of the materiality standard under § 2254(d)(1) requires de novo review of the entire claim, (2) the factual findings were unreasonable under § 2254(d)(2), or (3) the disputed factual questions involve mixed questions of law and fact and the unreasonable application of law rendered the fact-finding inadequate. Petitioner also argues that the undersigned should review de novo the instances of allegedly false testimony where the state court made no factual findings. Petitioner presents detailed argument on each of these points.

Respondent contends that Petitioner is required to rebut, through clear and convincing evidence, the presumption of correctness that generally attaches to a state court's factual findings under 28 U.S.C. § 2254(e)(1). He argues that Petitioner cannot meet this standard. Thus, accepting the state court's factual findings as true, Petitioner argues that any presentation of arguably false evidence was harmless beyond a

1    reasonable doubt. Ultimately, Respondent echoes arguments presented in his answer

2    and does not expressly address the issue presently before the Court, i.e., whether the

3    § 2254(e)(1) standard remains applicable once the Court has determined that the state

4    court's resolution of the legal issue was contrary to clearly established federal law.

### b.    Discussion

6         There is no clear Supreme Court case law regarding the standard of review to be

7    applied to state court factual findings once the Court has determined under § 2254(d)

8    that the state court's decision was contrary to clearly established federal law. The

9    undersigned previously stated that the Court must thereafter "resolve the claim without

10   the deference AEDPA otherwise requires." (ECF No. 72 at 51 (quoting Crittenden v.

11   Ayers, 624 F.3d 943, 954 (9th Cir. 2010)). The undersigned then applied de novo

12   review.

13        The District Judge rejected this analysis, stating that the cases cited by the

14   undersigned in support of this proposition hold only that a Court must review de novo

15   any legal questions or mixed legal and factual questions; they do not address whether

16   de novo review applies to purely factual determinations. (ECF No. 74 at 3-4.) The District

17   Judge went on to suggest that that the state court's purely factual findings are entitled to

18   deference under § 2254(d)(2) and/or § 2254(e)(1), even when § 2254(d)(1) has been

19   met. (ECF No. 74 at 4-5.)

20        The Ninth Circuit has somewhat recently addressed this issue, stating:

21        In reviewing the merits of a habeas petitioner's claim after § 2254(d) is
          satisfied, we still defer to a state court's factual findings under § 2254(e) in
22        two ways. First, those findings are presumed to be correct, a presumption that
          can be overcome only by clear and convincing evidence. See 28 U.S.C. §
23        2254(e)(1). Second, with limited exceptions, new evidence cannot be
          considered if "the applicant has failed to develop the factual basis of a claim
24        in State court proceedings," id. § 2254(e)(2)[.]

25   Crittenden v. Chappell ("Crittenden II"), 804 F.3d 998, 1011 (9th Cir. 2015).[8]

26   ───────────────────
     [8] One could perhaps question the Ninth Circuit's analysis in this regard, given that it relies on no authority
27   other than the statute itself, and the statute is less than clear in describing the interplay between its various
     provisions. See Murray v. Schriro, 745 F.3d 984, 1000-01 (9th Cir. 2014) (describing confusion regarding
28   relationship between § 2254(d)(2) and § 2254(e)(1)). Additionally, as stated above, other cases broadly
                                                                                           (continued…)

The Ninth Circuit there went on to conclude:

> Here, <u>Crittenden I</u> held the California Supreme Court's decision was contrary to clearly established law under § 2254(d)(1) because it applied an improper legal standard at <u>Batson</u> step one. Having made that determination, <u>Crittenden I</u> properly turned to the merits of Crittenden's <u>Batson</u> claim, while affording a presumption of correctness to the state trial court's factual findings under § 2254(e).

<u>Id.</u>

The Ninth Circuit has continued to reiterate the proposition that the presumption of correctness set out in § 2254(e) applies even after § 2254(d) has been met:

> If, considering only the record before the state court, we determine that the state court's decision was based on an unreasonable determination of the facts, we next evaluate the petitioner's legal claim de novo, and we may consider evidence presented for the first time in federal court. Still, even then, the state court's factual findings are entitled to a presumption of correctness that can be overcome only by clear and convincing evidence.

<u>Rodriguez v. McDonald</u>, 872 F.3d 908, 918 (9th Cir. 2017) (citations omitted).

Based on the foregoing, the undersigned now concludes that the state court's purely factual determinations are entitled to a presumption of correctness that may be rebutted only by clear and convincing evidence.

### 4. Analysis of Petitioner's False Statement Claims under Applicable Standard of Review

Petitioner presents as violations of <u>Napue</u> the same three categories of evidence he asserted had been undisclosed under <u>Brady</u>. Specifically, Petitioner asserts that the prosecution provided false testimony regarding (1) additional cash payments to Ybarra, (2) Ybarra's undisclosed activity as an informant, and (3) whether Ybarra served his eight month jail term for theft.

### a. Monetary Payments

---

(…continued)

state that, once § 2254(d)(1) is met, "the federal court must then resolve the claim without the deference AEDPA otherwise requires." <u>Panetti v. Quarterman</u>, 551 U.S. 930, 934 (2007); <u>Crittenden v. Ayers</u> ("<u>Crittenden I</u>"), 624 F.3d 943, 954 (9th Cir. 2010). In any event, however, the law applied a presumption of correctness to a state court's factual determinations even prior to AEDPA. <u>Marshall v. Lonberger</u>, 459 U.S. 422, 432 (1983). "This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even 'fair support' in the record." <u>Id.</u>

1    Petitioner asserts that Fontes falsely testified at trial that Ybarra was not provided

2    any compensation prior to being placed in the witness protection program. Petitioner

3    asserts that these false statements create an impression that Ybarra was not testifying in

4    exchange for any sort of compensation, when in reality, he had a history of receiving

5    compensation from the county.

6    On this question, the state court did not render any factual findings. Accordingly,

7    the presumption of correctness does not apply as there are no factual findings to which

8    this Court might defer. <u>Taylor v. Maddox</u>, 366 F.3d 992, 1000–01 (9th Cir. 2004) ("No

9    doubt the simplest is the situation where the state court should have made a finding of

10   fact but neglected to do so. In that situation, the state-court factual determination is

11   perforce unreasonable and there is nothing to which the presumption of correctness can

12   attach.") The Court therefore will review these factual contentions de novo.

13   At trial, during his questioning from the prosecution, Fontes twice described how

14   he only provided Ybarra funds when he was placed in the witness protection program in

15   June 1989 as protection from his brother, and stated that at no time earlier did he either

16   promise or provide money to Ybarra. (Rep. Tr. Vol. XXII at 2948, 2993.)

> Q. was there any participation of Mr. Ybarra in a Witness Protection
> Program before June of 1989?
> A: --No.--
> Q. Was there any money given to him either directly or indirectly to your
> knowledge prior to that time?
> A. No.

(Rep. Tr. Vol. XXII at 2948.)

> Q. Now, Mr. McAllister asked you questions about the method in which
> you handled the administration of the witness protection funds regarding
> Mr. Ybarra?
> A. Yes.
> Q. You told us, I believe, that you had not provided him with any funds
> prior to June of '89. Is that correct?
> A. That's correct.
> Q. Had you ever promised many any money prior to June of '89?
> A. No.
> Q. Had you ever told him about the witness protection program prior to
> June of '89?
> A. Possibly in May of '89.
> Q. Okay. Between say January of '88 and May of '89 did you say anything
> to Mr. Ybarra to cause him to think that he might be able to get some

money somehow?
A. No.
Q. Are you aware of anybody else doing that?
A. Not that I am aware of.

(Rep. Tr. Vol. XXII at 2993.) He also testified that he did not give money directly to

Ybarra:

Q. Was the money given directly to the witness?
A. No.
Q. Why not?
A. This particular case I felt it would be better if I monitored the money.
Q. Did you do that?
A. Yes, I did.

(Rep. Tr., Vol. XXII at 2948-49.)

Later, on re-direct question, the prosecution asked, and Fontes confirmed, that

Ybarra was not given funds prior to entering in the witness protection program.

Q. Now, Mr. McAllister asked you questions about the method in which
you handled the administration of the witness protection funds regarding
Mr. Ybarra?
A. Yes.
Q. You told us, I believe, that you had not provided him with any funds
prior to June of '89. Is that correct?
A. That's correct.
Q. Had you ever promised many any money prior to June of '89
A. No.
Q. Had you ever told him about the witness protection program prior to
June of '89?
A. Possibly in May of '89.
Q. Okay. Between say January of '88 and May of '89 did you say anything
to Mr. Ybarra to cause him to think that he might be able to get some
money somehow?
A. No.
Q. Are you aware of anybody else doing that?
A. Not that I am aware of.
Q. Did you or did anything else that you know about promise him any
consideration or help on any cases?
A. No.

(Rep Tr. Vol. XXII at 2993.)

Seventeen years later at the evidentiary hearing, Fontes admitted that he

provided payments to Ybarra in 1988, prior to being placed in the witness protection

program:

Q. Did you ever provide cash payments to Ybarra?
A. Yes, I did.
Q. Do you recall testifying at trial that you never gave any money -- at the
Hernandez trial that you never gave any money to Ybarra?

56

A. That I never gave any money to Ybarra?

Q. Yes.

A. Ever?

Q. Yes.

A. No, I don't recall testifying to that fact.

Q. Would it refresh your recollection to look at the transcript?

A. It may.

THE COURT: Why don't you show him whatever you want him to look at.

MR. HERSEK: Volume 22, pages 2948, 2949, starting on the bottom of page 2948 at line 27 and going to the next page to line two.

THE COURT: All right. Now, Mr. Fonts, read those pages to yourself and see if that refreshes your recollection. Then we'll ask you some questions about them.

THE WITNESS: (Witness reading.) Okay.

MR. COLANGELO: Q. Does that refresh your recollection as to your testimony?

A. Yes, I understand what the testimony says. It says were there any monies given to him.

Q. And you said that no money was given to him?

A. That's what it said. The line above that was talking about the Witness Protection Program and when he was brought into the Witness Protection Program. Then going on after that, it says were there any other monies given to him, or something like that. I was assuming you were talking about due to the Witness Protection Program.

Q. Actually I'm talking about prior to the Witness Protection Program. Did you give any money to Anthony Ybarra?

A. I'm sure I have. I don't know of those particular instances. I've bought him cigarettes before.

Q. Didn't you testify at Hernandez trial that prior to Ybarra being placed in the Witness Protection Program you did not give any money to Ybarra?

A. That's what -- yes, according to that transcript, that's exactly what I testified to.

Q. But you did give money to Ybarra; is that correct?

A. I'm sure there were times when I bought him a pack of cigarettes. Giving him cash money, I don't know that I did give him cash money. I know when he was under -- on the Witness Protection Program, I may have bought him a hamburger when he was testifying. You know, this is 17 19 years ago or so.

Q. Did Ybarra ever ask you for money to repay a loan to his mother?

A. I have no recollection of that.

MR. COLANGELO: Your Honor, I'd like to show him an exhibit, see if it refreshes his recollection.

THE COURT: Is that Exhibit J?

MR. COLANGELO: Yes, Your Honor.

THE COURT: Okay.

MR. COLANGELO: Thank you.

THE COURT: Mr. Fonts, look at this Exhibit J and see if this refreshes your recollection about any money paid to Mr. Ybarra. Read it to yourself and then let us know when you're ready to talk about it.

THE WITNESS: (Witness reading.) Okay. I've read it.

MR. COLANGELO: Q. Does that refresh your recollection money was given?

A. Yes, it does.

Q. That included money to repay a loan to his mother?

A. Well, when you said pay a loan, I was thinking he borrowed money and I paid him. In other words, he borrowed money to get from point A to point

B, and I gave him money to cover that expense, yes.
Q. And you gave him more money, the page after that. On other occasions you gave him more money; is that correct?
A. Yes, that's correct.
Q. This is in 1988; right?
A. The date of this memo is December 8th, 1988.
Q. And that's before Anthony Ybarra was placed in the Witness Protection Program; is that correct?
A. That's correct.
Q. Do you remember when he was placed in that program?
A. Sometime in '89, middle of the year, I'm not sure of the date.
Q. So those monies in 1988 had nothing to do with protection; is that right?
A. No, had nothing to do with protection.

(ECF No. 52-3 at 69-72.)

Fontes later clarifies that while at trial he was speaking about money given to Ybarra through the witness protection program. He acknowledges that he provided money to Ybarra prior to his enrollment in the witness protection program:

MR. WESTMORELAND: Q. So I'm understanding, the question on page 2948, line 12 of the RT, "Was there any money given to him either directly or indirectly, to your knowledge, prior to that time," and your answer, "No." Is that "no" in the context of the Witness Protection Program?
A. That's what we were talking about at the time. But it's obvious that he received monies prior to that because there's receipts here.

(ECF No. 52-3 at 86.)

When first questioned at the evidentiary hearing, Ybarra flatly denied that he received any benefits for his testimony in Padilla or Petitioner's trials:

Q. Did you testify in the Jesse Hernandez case?
A. Yes, I did.
Q. At his trial?
A. Yes.
Q. And also did you testify at the Alfredo Padilla trial?
A. Yes, I did.
Q. And do you recall whether you testified – whether or not you got a deal for testifying for the prosecution?
A. No deals whatsoever.
Q. They didn't give you any favors?
A. No, sir.
Q. No benefits?
A. No.
Q. No leniency as far as jail time?
A. No.

(ECF No. 52-3 at 35.) After further questioning at the evidentiary hearing, Ybarra likewise testified that he received money from Fontes prior to entering the witness

58

1 | protection program.

2 | MR. COLANGELO: Q. You testify at the Hernandez trial that the DA did
not give you any money; correct?
3 | A. I think so, yes.
Q. And that testimony was false?
<u>4</u> | A. No. It wasn't false. They didn't gave me the money.
Q. Excuse me. I didn't hear that?
5 | A. They didn't gave me the money.
Q. They didn't give you the money?
6 | A. No. Just helped me out with it.
Q. We had those receipts to you; right?
7 | A. Uh-huh.
Q. What happened was you went to Al Fonts and said, "I need to repay a
8 | loan to my mother. Can I get some money"; correct?
MR. WESTMORELAND: Objection. Counsel's testifying here
9 | MR. COLANGELO: Your Honor --
THE COURT: Both stop. He's asking you -- the objection is it assumes
10 | facts not in evidence, but you can rephrase the question as to whether or
not he said this to  Mr. Fonts. Try it that way.
11 | MR. COLANGELO: I wasn't finished asking the question.
THE COURT: I know, but he interrupted you so I got in the middle of it.
12 | MR. COLANGELO: Did you not go to -- excuse me just a minute.
Q. Isn't that correct that you went to Al Fonts and said, "I need some
13 | money to repay my mother for a loan"?
A. It was for rent.
14 | Q. It was for rent. So all that money they gave you was for rent?
MR. WESTMORELAND: Objection. Vague as to "all that money."
15 | THE COURT: Sustained.
MR. COLANGELO: Q. The $150 they gave you was for rent?
16 | A. For rent, yes, sir.

17 | (ECF No. 52-3 at 49-51.)

18 | In addition to the testimony from the evidentiary hearing, the internal memos

19 | prepared by Fontes clearly indicate that Ybarra had both requested and expected

20 | monetary payments prior to testifying, and that Fontes thought it best to provide Ybarra

21 | money to make sure that he would testify. (Pet., Ex. J.) Fontes specifically notes that

22 | Ybarra had requested money at least twice, and that he "anticipate[d] that he will be

23 | back each week for more money until he has to testify." (<u>Id.</u>)

24 | Based on the evidence now before the Court, there is no question but that the

25 | testimony the prosecution presented about Ybarra's receipt of monetary benefits was

26 | false.

27 | Both Ybarra and Fontes testified Ybarra had not received benefits for cooperation

28 | prior to the time he entered the witness protection program. In fact Ybarra had requested

and received money directly from Fontes before then. Even though Fontes' official memoranda confirm this, Fontes testified at the time that Ybarra had not received or expected monetary compensation.

Having found that false testimony was presented, the Court addresses whether the prosecution knew or should have known that the testimony was false and, if so, attempted to correct it. A "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419 at 437-438; Strickler v. Greene, 527 U.S. 263, 280-281 (1999). Further, the Ninth Circuit has observed that "[b]ecause the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." Amado v. Gonzalez, 758 F.3d 1119, 1134 (9th Cir. 2014); Carriger v. Stewart, 132 F.3d 463, 480 (9th Cir. 1997) (en banc).

The prosecution should have known -- and, in the Court's view, had to have known -- that the testimony provided by Fontes regarding Ybarra's receipt of undisclosed monetary benefits was false. The prosecution was responsible for disclosing any information regarding Ybarra known by Fontes, an employee of the prosecutor's office. Amado, 758 F.3d at 1134 (prosecution responsible for failing to disclose what it could have learned from other government agents.). The payment of benefits to Ybarra prior to providing testimony in Padilla and Petitioner's trial had to be known to the prosecution. The payments were from the prosecutor's own office – the Stainslaus County District Attorney, and were made by the district attorney investigator actively assigned to the case. At trial, Fontes, as a representative of the Stanislaus County District Attorney's office, testified that Ybarra was not provided monetary benefits until he was in the witness protection program. The prosecutor knew or should have known of the payments to Ybarra from his own office. The prosecutor's own files contained memos, undisclosed to the defense, of Fontes' requests for money to provide to Ybarra. These records in prosecution files document that the trial testimony from both Fontes and Ybarra was

known to be false. Petitioner has met the second element of the claim under Napue/Giglo.

The Court will first consider whether the prosecution offered other false evidence before turning to the question of whether the false evidence, collectively, was material. See Jackson, 513 F.3d at 1076.

### b. Informant - Law Enforcement History

Petitioner contends that Ybarra gave false testimony at trial regarding informant activities that occurred in 1981 and 1988. The state court concluded that the disputed testimony was not false because it was not a blanket denial of any other informant activity:

> The last area raised by petitioner as affecting the verdict relates to the documents showing that Ybarra was an informant prior to 1984 and Ybarra's testimony regarding his informant activities. Ybarra admitted to being an informant. He admitted that he asked for protective custody when he was in jail because he was an informant. He testified that he could not go to the Lawson house to buy drugs because they knew he was an informant. When questioned by petitioner's counsel, the questions regarding his informant activity were in the context of 1984 and his activities at that time. At trial Ybarra was asked if he acted as an informant as a result of his arrest for the theft that resulted in his theft conviction. He said he was not an informant at that time. Petitioner characterizes this as testimony from Ybarra denying any other informant activity. We do not read the testimony as such and do not find that Ybarra gave false testimony.

In re Hernandez, 2010 WL 1390847, at *15.

During trial, Ybarra testified to his past informant activity in 1984, but failed to disclose that he was also an informant in 1981 and in 1988, after the murder of Alvarado occurred:

> Q. What happened in the summer, this arrest for petty theft happened some time in the summer and that is sometime around when you are no longer allowed inside the house?
> A. Yes.
> Q. It is after that that you are no longer allowed inside the house?
> A. Yes, sir.
> Q. Had you - as a result of this arrest for petty theft that summer, had you then become an informant for the police?
> A. No. I wasn't an informant anymore. I wasn't working. This happened back in when I was an informant
> Q. Mr. Ybarra. Just answer my question.
> A. No, I wasn't.
> Q. We can connect the answer then back up with the question, I think the

1  question was as a result of this arrest for petty theft in the summer of '87, that didn't result in you becoming an informant?
   A. Oh, no ..
2  Q. But for some reason after that arrest, you were not allowed in the house anymore. Is that right?
3  A. Yes, sir.

4  (Rep. Tr. Vol XII at 1685-86, ECF No. 38-1.)

5  When asked on cross-examination, regarding when he became an informant,

6  Ybarra stated that it was in 1984:

7  Q. Now, you mentioned in yesterday's testimony, Mr. Ybarra, you told us yesterday, I believe, that you had been an informant before this. Correct? I
8  mean before 1987.
   A. Yes.
9  Q. And when you had been an informant before was that in 1984?
   A. Yes, sir.
10 Q. And it was in 1984 that you became an informant for the county drug enforcement unit. Is that right?
11 A. Yes, sir.

12 (Rep. Tr., Vol. XII at 1688.)

13 Ybarra also denied that he asked for any assistance with the theft of the

14 lawnmower when asked by the prosecution:

15 Q. Did you ever at any time before or after the tape that we heard ask them to give you any help with any lawn mower caper or anything else?
16 A. No, sir.

17 (Rep. Tr., Vol. XIII at 1849.)

18 As described above with regard to Petitioner's <u>Brady</u> claim, records produced

19 post-trial establish that Ybarra acted as an informant prior to 1984 and, more importantly,

20 during 1988 – after Alvarado's murder, but before testifying against Petitioner. Ybarra

21 admitted the additional activity at the evidentiary hearing:

22 MR. COLANGELO: Q. Mr. Ybarra, you testified -- isn't that correct? -- at the Hernandez trial that you had been an informant for the prosecution in
23 1984?
   A. Yes.
24 Q. But you'd also been an informant for the prosecution in 1981; correct?
   A. I believe so, yes, sir.
25 Q. And in 1982; correct?
   A. Yes.
26 Q. And in 1988; correct?
   A. Yes.
27 Q. In the 1988 circumstance, that was after you had come forward with your information on the Hernandez case; correct?
28 A. Yes.

Q. And you did some drug deals for law enforcement in order to get leniency for your brother; correct?
A. Yes.
Q. That's your brother Gilbert?
A. Yes.
Q. And your brother Gilbert had been arrested for a burglary for stealing a lawnmower; correct?
A. Yes.
Q. That's how you came to be involved in the Hernandez case; correct?
A. Yes.

(ECF No. 52-3 at 52.)

It is without question that Ybarra testified falsely at trial when he stated that he did not, at any time, "ask them to give you any help with any lawn mower caper or anything else." At the evidentiary hearing, Ybarra admitted that he acted as an informant in 1988 in exchange for leniency to his brother in the lawnmower theft.[9] The state court made no factual findings regarding this testimony and the Court now concludes that this trial testimony was false.

It also is apparent that Ybarra was acting as an informant in 1981 and 1982. Accordingly, any testimony at trial reflecting that he did not begin informant activities until 1984 would have been false. The state court, however, concluded that Ybarra did not so testify at trial. Instead, the state court construed "the questions regarding his informant activity" as pertaining to "1984 and his activities at that time." In other words, the state court determined that Ybarra was not questioned at trial regarding informant activities outside this time frame. It is this factual determination that the Court must now review under § 2254(d)(2) and/or (e)(1).

As an initial matter, the Court notes that the presumption of correctness that attaches to this factual finding is somewhat reduced. The finding was made in a collateral proceeding almost two decades after the testimony at issue was adduced. Miller-El v. Dretke, 545 U.S. 231, 241 n.1 (2005) ("Other evidence was presented in the

_____
[9] Ybarra denied at trial that he sought benefit in connection with the lawnmower theft. His answer might be characterized as literally true since the assistance sought was for his brother, not him. Such a characterization would be, and here is, rejected as artificial and contrary to reason. Ybarra did in fact seek and receive a benefit, albeit a benefit for a close family member, rather than directly for himself. An indirect benefit is a benefit nonetheless.

1  <u>Batson</u> . . . hearing, but this was offered two years after trial and was subject to the

2  usual risks of imprecision and distortion from the passage of time." (quotation marks

3  omitted)). Nonetheless, the Court cannot say that the presumption has been overcome

4  by clear and convincing evidence or that this was an unreasonable determination of the

5  facts in light of the evidence before the state court. This Court would have reached the

6  opposition conclusion based on Ybarra's testimony that he "<u>became</u> an informant for the

7  county drug enforcement unit" in 1984, strongly impliying that his informant activities

8  began at that time. Nonetheless, under the circumstances, the Court concludes it is

9  bound by the state's factual determination.

10        Accordingly, the only false testimony presented regarding Ybarra's informant

11  activities involves his efforts in 1988 to obtain leniency for his brother in relation to the

12  "lawn mower caper." The Court will consider the materiality of this statement below,

13  along with the other false evidence.

14                        **c.     Informant's Theft Sentence**

15        Petitioner, in the third category of allegedly false testimony, contends that Fontes

16  and district attorney Barrett's trial statements about Ybarra having served his theft

17  conviction were false. This claim is based on the same underlying evidence previously

18  discussed about Ybarra in fact being released from Stanislaus County Jail, rather than

19  transferred to Tuolumne County jail to serve the remainder of the sentence.

20        At trial, both Ybarra and Fontes testified that Ybarra served his eight month

21  sentence for theft with a petty theft prior. Fontes explained:

22        Q. Can you tell the jury when it was and how it was that he became
          involved in that program?
23        A. I believe it was in May of '89, after being released, after having spent
          eight months in the county jail, he returned to Modesto, was involved in an
24        altercation at his home. I was contacted by the sheriff dispatch in the
          middle of the night and met with him. Put him up in a motel for a few days
25        and put together an application to try to get him into the Witness
          Protection Program because his life had been threatened.
26
      (Rep. Tr. Vol. XXII at 2944.)
27
          Q. And were you aware of when he went on felony probation?
28        A. I believe when he plead guilty, I believe it was in December of '88, and

64

he received probation and county jail time. He served eight months. I believe he went in December and got out in May and he was on a total of three years probation. I believe he is still on probation.

(Rep. Tr. Vol. XXII at 2970.) And Ybarra elaborated about serving the sentence:

> Q. Have you ever been convicted of a felony, Mr. Ybarra?
> A. Yes, I have.
> Q. And approximately when was that?
> A. I was sentenced back in '80 -- the last month of '87, I think December. And I served my sentence. I did eight months of '88.
> Q. You actually did eight months?
> A. Yes, I did.
> Q. What was your sentence?
> A. It was for grand theft and petty theft with a prior.
> Q. Okay. Two counts?
> A. The grand theft was one count and then petty theft was three counts of petty theft. I don't remember that good.
> Q. And your sentence for those two, those were both felonies?
> A. Yes. But it was -- at the end they combined all the -- the -- the priors and everything they combined them into one thing and I was -- it was a plea bargain at the end.
> Q. Was that in this county?
> A. Yes, sir."

(Rep. Tr. Vol XI at 1615-16.)

Neither Fontes nor Ybarra mentioned serving the sentence out of county. District attorney Barrett did mention that she asked that Ybarra be able to serve the sentence out of county for his protection. (Rep. Tr. Vol. XXI at 2904.)

At the evidentiary hearing, Ybarra explains that he lied to Petitioner's counsel when they had a conversation about a month prior to the hearing. In his previous conversation, he told Petitioner's counsel that he did not serve his sentence in Tuolumne County or that he was ever on a work release program:

> Q. And you told me you did not serve that eight-month sentence in Tuolumne County?
> A. Yes, I did say that, uh-huh.
> Q. And now you're saying something different?
> A. Yes, I am.
> Q. Did you tell me you went out on a work release program ever?
> A. I'm sorry. What's that?
> Q. Did you tell me you had never been on a work release program?
> A. I believe I did.
> Q. Now you're saying you were on a work release program?
> A. Yes, I'm saying that now.
> Q. Now is when you're in Tuolumne County Jail?
> A. Yes.

(ECF No. 52-3 at 39.)

Q. After you talked to me, you provided a taped statement to Mr. Westmoreland, seated over at the far end of the table?
A. Yes, sir.
Q. And was he accompanied by two special agents?
A. I believe so, yes, sir.
Q. And did they show you their badges?
A. I -- yes, sir. Uh-huh.
Q. Are you on parole right now?
A. I'm -- I should be on parole. I should be off parole this month.
Q. When you talked to Mr. Westmoreland and the special agents, were you worried about your parole status?
A. No, sir.
Q. So the information you told me about never being in Tuolumne County Jail except for those three days is false?
A. Yes.
Q. And the information you told me about never being on a work release program was false?
A. Yes, sir.
Q. But now you're telling the truth?
A. Yes, sir.

(ECF No. 52-3 at 40.)

Ybarra later acknowledged that after his conversation with Petitioner's counsel, he

provided a taped statement in the presence of the California Attorney General and two

special agents where he changed his story regarding his confinement, and only

mentioned Tuolumne County or work release after it was mentioned by Respondent:

MR. COLANGELO: Q. When you talked to Mr. Westmoreland and the special agents, he's the one that first mentioned Tuolumne County Jail?
A. I believe so, yes, sir.
Q. He asked you if you'd been in Tuolumne County Jail, and you said yes?
A. Yes.
Q. And Mr. Westmoreland is the one that first mentioned the work release program; right?
A. I was asked so many things that day, but I believe I think he did. I'm not sure.
Q. He asked you if you'd been on the work release program, and you said yes?
A. Uh-huh. Yes.
Q. You didn't volunteer that information?
A. I'm sorry. What now?
Q. You didn't volunteer that information on your own?
A. I readily admitted to what I was saying, to what he asked me. I gave him a rightful answer, a truthful answer.
Q. Unlike when you talked to me?
A. Yes, sir.

(ECF No. 52-3 at 42.)

There is no definitive evidence as to whether Ybarra served all or even a good

portion of his theft conviction sentence. Both Fontes and Ybarra stated he did and were the only witnesses to testify in support of the fact. However, as noted, the evidence before this Court, or perhaps the lack of any of the corroborating evidence one might expect, creates genuine doubt as to the truth of such claims. Nonetheless, the state court made a factual finding that the evidence indicated that Ybarra served his sentence in a different county. Having found that the evidence did not support the conclusion that Ybarra was released early, the Court held there was no false evidence presented at trial in this regard.

As noted above regarding Petitioner's Brady claim, the state court, in the last reasoned decision, found Fontes' testimony to be credible, and inferred from the timing of Ybarra's requests for consideration and his first meeting with his probation officer, that Ybarra was transferred and served his sentence in another county until roughly May 1989. In reaching this determination, the state court did take into consideration Ybarra's incarceration records, and found that the "documents merely reinforce the evidence that Ybarra served his sentence out of the county and under a different name." (ECF No. 1-7 at 105.) This factual determination was reasonable. Reasonable jurists could disagree as to Ybarra's custody, but, given the evidence that Ybarra reported in June 1989 to sign the terms of his probation, there was a sufficiently strong evidentiary basis for finding that Petitioner served his theft sentence out of county. It is true that Ybarra's criminal records all state that he was 'released' from Stanislaus County rather than 'transferred,' and that the calculation of credits for time served are confusing in not reflecting Ybarra's time in custody for the theft conviction. However, in light of the consistent testimony of district attorney Barrett at Petitioner's trial and Fontes at the evidentiary hearing -- that Ybarra was transferred to Tuolumne County to serve his sentence -- reasonable jurists could disagree as to the correctness of the state court's factual finding that Ybarra was transferred and served his sentence in Tuolumne County.

Accordingly, Petitioner has failed to rebut the presumption of correctness that attaches to the state court's determination that false evidence was not presented

regarding Ybarra's theft sentence.

### 4.    Materiality

The Court reiterates that it is not required to defer to the state court's determination that the alleged false testimony was immaterial. As noted above, the state court applied the Brady standard for materiality to Petitioner's Napue claim, and in so doing, rendered a decision that was contrary to controlling Supreme Court precedent. The undersigned accordingly review the materiality of the false evidence de novo.

To determine materiality, the Court must determine if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Much of the argument regarding materiality has been set forth above in reviewing the state court's decision with regard to the Brady violations, and will not be repeated. At trial, the jury was made aware that Ybarra had acted as an informant in the past for monetary benefit. The jury was also aware that Ybarra received significant compensation for testifying, albeit mostly not in the form of cash payments, through the witness protection program. Finally, there was strong evidence, aside from Ybarra's testimony, that implicated Petitioner in Alvarado's murder.

When attempting to determine whether the false statements would potentially influence the judgment of the jury, the Court will look first at how the prosecution attempted to frame the evidence, including the credibility of Ybarra. Second, the Court will attempt to determine how the jury's interpretation of the evidence might reasonably have changed had it not been provided false testimony.

After presenting false testimony from Ybarra and Fontes regarding monetary benefits and Ybarra's continued activity as an informant, the prosecution argued during closing statements that there was no evidence to support Petitioner's claim that Ybarra was testifying or acting as informant to receive benefits:

> How many of you understood when you came here to be selected as jurors exactly how the law worked with respect to special circumstances attaching to a murder and creating a death penalty case?

68

And all of you are more intelligent and more educated, more informed, each of you is, than Anthony Ybarra. Yet they're insinuation, nothing more than that and it is unproven, is that Anthony Ybarra fabricated this whole thing, the complete deal, to get himself out of trouble on the lawn mower caper.

(Rep. Tr., Vol. XXVI, at 3369.) As described above, whether it was for his testimony in the Alvarado murder, or for his informant testimony in other cases in 1988, Ybarra testified at the evidentiary hearing that he cooperated with the prosecution specifically for that purpose – to help get his brother out of trouble in the lawnmower theft.

The prosecution further argued that the jury should find Ybarra's testimony to be credible as he did not specifically seek out a deal and was not intelligent enough to make a deal in exchange for testifying:

Now the guy that is supposedly bright enough to figure all this out, that is going to create fiction and somehow that is going to result in his getting out of trouble on this burglary on this lawn mower caper, you think that guy who is bright enough to figure that out, doesn't go to police and say, "I got the goods on this murder case, but you have this annoying little burglary caper hanging, make me a deal, promise to dismiss it, promise to cut me some slack, promise you're going to put me in witness protection." He doesn't say any of that. You know that for an absolute fact. Play the tape recording of the interview that Anthony Ybarra gave on the 7th of January, 1988. He doesn't say, "I'll tell you about the- murder once you do something for me." He makes no condition. He makes no deals. There is no evidence in front of you that he did. In fact, the guy gets put in jail at least three times, once on a one-year sentence for which he did eight months, and then got his good time and work time on a felony after all this happened. The guy is not bright enough to have made this up for some ulterior purpose. If he was bright enough to have done that, he sure as the world would have gotten a promise or a deal made to get himself out of trouble on the thing that they are insinuating was a reason he made it up in the first place, and he doesn't." (Rep. Tr., Vol. XXVI, at 3370.)

…

"Again, the focus sought to be offered here as a distraction is that Anthony Ybarra is a doper and a thief. Anthony Ybarra told you himself he is a doper and a thief. Is it all together surprising to you that the evidence establishes he is just exactly what he told you he was, an ex-felon and a doper and a thief. He wouldn't have been over there with the rest of these dopers if he wasn't.

He wouldn't have been over there trying to get his wake-up just like Goosey was doing, just like the defendant was doing, just like the guy that came and sent Betty out into the trailer to get some dope, right on down the line, if he wasn't exactly what he says he was.

And again, this guy supposedly so sophisticated that he makes all this up to, you know, get a deal for himself, and isn't smart enough to ask

69

for a deal to say, hey, promise me something, do something for me or I won't tell you all the inside details about this murder. He just spills his guts on tape two days after they are talking about all of this that morning with the defendant Jesse Hernandez and never once conditions it."

(Rep. Tr., Vol. XXVI, at 3397-98.) The prosecution clearly attempts to paint Ybarra as a simple "doper and a thief," not intellectually capable of fabricating a story or requesting benefits. The prosecution was able to present this line of argument by presenting Fontes' false testimony that Ybarra only received benefits through the witness protection program after he was physically threatened. Had the prosecution not presented false evidence, the jury would have known that Ybarra had an ongoing relationship with local law enforcement, including the Stanislaus County District Attorney, and that Ybarra both requested and expected compensation and benefits for his testimony. The prosecution would not have been able argue that there was no evidence Ybarra sought benefits and argue that he was in fact too unsophisticated even to do so. The effect of this is difficult to measure, but certainly one must say it is possible the jury might have been affected had the prosecution not been able to so rehabilitate Ybarra's testimony; more possible they might have been affected by the truth regarding Ybarra's relationship with Fontes.

The prosecution also argued that defense counsel's attempt to impeach Ybarra was ineffective and that if there had been a better defense to Ybarra's testimony, Petitioner's counsel would have used it.

They're taking a swing here at Anthony Ybarra to draw your attention away to an admitted heroin user, ex-felon, and they have, but away from a cold- blooded, deliberate murderer, who is a friend of that girl's also, and yet thought so little of her that no matter who suggests it, and get back to something with Anthony Ybarra for a minute.

McAllister had him on a witness stand on cross- examination for two days after I had him on Direct for one afternoon. And you heard about the times he's testified before. That's similar to what he's been put through every time he has been on the witness stand in all those other proceedings and I won't reiterate them. And you know from what was quoted to you that everybody has transcripts of those proceedings and they can come back and impeach Anthony Ybarra with anything he says wrong, anything that he leaves out, anything that he says different.

And what kind of impeachment do you hear, grinding him over the

coals for two days? You don't remember what color the cord was that the light was hanging from inside the trailer, do you? You don't remember how many minutes it was that they were in the house, whether it was five or 15, when they went back in the house after they were in the trailer. You don't remember how long Betty was in the trailer when she came out there to get some dope.

Go over your notes of what the impeachment was of Anthony Ybarra and think about the notion that if they had anything better than that to use they would have used it. And they don't and they didn't.

(Rep. Tr., Vol. XXVI, at 3401.) Of course the reason the defense could not present better impeachment evidence against Ybarra was because the prosecution presented false testimony which the defense could not impeach because the prosecution had failed to disclose that impeaching evidence.

Later in closing, the prosecution again explained that Ybarra did not ask for, and did not receive any benefit from testifying until after he was physically threatened and placed in the witness protection program.

In the discussion then of Anthony Ybarra, he points out the fact that the guy was an informant before. Anthony told you all about that. Mr. Ybarra told you that he was not welcome in that house because of the implications of that and they strip searched him and all the things that happened, repercussions of that. There was absolutely no evidence provided that he was on a witness protection program or anything like that before.

McAllister points out two or three times, I can't recall specifically how many, comments about the fact that the guy was on the witness protection program and got money. He did. You heard it in testimony from Mr. Fontes.

What's the significance concerning how and when that happened? He doesn't get on the program until a year and a half after the murder, after he's been assaulted, after the testimony that came in this case showed you that his life had been threatened and after he had testified in numerous prior proceedings and after he made numerous statements already to the police.

In other words, the cat was out of the bag. He told his story. They knew all about it. There's no evidence that he knew about the witness protection program, ever asked for it or was ever told by anybody in law enforcement either that it existed or that he would get on it or could get on it. It's something that happened later after he was victimized and threatened in part in connection with having been a witness.

I submit to you it doesn't effect his statement originally because it all happens afterwards.

71

Oh, but he did it intending to get into this. You don't need to make a written deal. You just-- you just hope. You just figure that maybe something like this will come your way. Interesting.

What happens to Tumbleweed? He makes a statement to the police. There's no deal, there's no promises, there's nothing there. He gets subpoened into court. He comes in, he gets grilled by both sides. You make a statement, the police put it in a report. Somebody comes and slaps a subpoena on you like you're Enrique Jimenez and you go to court. You ask what happened. You say whatever you want. And if there's some inconsistent prior testimony or some inconsistent prior statement to the police, some doggone attorney is reading it back to you while you're there on the witness stand.

What happens if Anthony tells this without any promises or deals? He gets subpoened into court and he comes in and tells the story or gets it shoved down his throat. He didn't have any expectation of getting anything or he would have asked for it. He didn't have the mental capability to contrive all of this up. And if he had had that kind of brains he would have figured out to get his deal made to get his promises, to get him out of trouble on this lawn mower caper before when we got no Johnny Alvarado, no victim. Where is the answer to that?

(Rep. Tr., Vol. XXVII, at 3555-58.) In other words, the prosecution based its defense of Ybarra's credibility on the false statements. Ybarra was able to falsely state without contradiction that he did not receive any benefits with regard to the lawnmower theft. However, his later testimony at the evidentiary hearing confirms that he acted as an informant in 1988 to assist his brother with regard to the lawnmower theft. Without Ybarra's false testimony about acting as an informant in 1988, it is possible that the jury would have called into question whether he acted as an informant in exchange for not being implicated as an accomplice in the lawnmower theft or for other benefits.

Likewise, the fact that Ybarra and Fontes falsely stated that Ybarra neither expected nor received benefits prior to testifying against Petitioner created the impression that Ybarra had no incentive to provide testimony for the prosecution. If the jury knew that there was an arrangement to provide Ybarra compensation in late 1988, the jury might question whether his later placement in the witness protection program was just an excuse to provide him even further benefits, and ultimately whether he provided truthful testimony at trial.

The prosecution argued that there was no evidence that Ybarra had made a deal

1  in exchange for his testimony, and that it was even more far-fetched to think Ybarra

2  would have had an unspoken compensation arrangement, when they knew or should

3  have known that was precisely the case. Whether or not Ybarra's testimony was

4  accurate, by providing false testimony, the prosecution misled the jury into thinking that

5  Ybarra was not motivated to testify for monetary benefits. Based on the false testimony,

6  defense counsel was not able to do what any reasonable attorney would have done--

7  present significant additional impeachment evidence against Ybarra.

8  　　　While the prosecution attempted to bolster Ybarra's testimony, defense counsel

9  took the opportunity on closing to point out why Ybarra was not credible. He repeatedly

10  argued that Ybarra's was motivated by his past informant activity and its rewards to

11  provide favorable testimony for the prosecution. However, counsel was not able to

12  include in his argument the significant, but withheld, additional impeachment evidence

13  to attack Ybarra's credibility:

14  　　　Mr. Ybarra is a professional informer. He's done this before. 1984
     he became an informer, made cases on people and you may remember
15   some testimony that we had. I asked him some questions about when he
     had been an informer before and he said that or that we got out the fact
16   that he had made even more cases on people than the police had asked
     for. And I asked him some questions about that. I think his answers were
17   kind of interesting.

18  　　　He first said in here in court, he said well, yeah I did that because I
     needed more money for drugs. So he got -- obviously from that I guess we
19   are to assume that he got money when he was an informer before. I read
     the transcript from one of his cases before and he said the reason was, he
20   didn't use these words, but it was like an insurance policy. Gee, maybe,
     you know, maybe some of the cases will get thrown out and then I will
21   have a safety net here of a couple extra cases, so that's why he did it.

22  　　　But I think it's interesting for a couple of reasons anyway. One is he
     knows the value of insurance, if I can use the fact of him being an informer
23   as some kind of insurance, and here is a guy who certainly needs some
     insurance because he is a guy who is destined to keep getting arrested
24   and arrested and arrested, which is what has happened. It's also
     interesting because he knows when he's an informer in this case he gets
25   paid. He must have been a prophet in this case. He got seven thousand
     dollars in goods and services and cash for being an informer in this case.
26   Got put up and had Mr. Fontes do his grocery shopping for him. It was real
     nice.

27  　　　So we're dealing with a professional here who he's even testified
28   before, it's not like you get somebody-- I mean the jurors, you jurors have

73

had to answer a lot of questions out here in court and all that while we were picking a jury and you know that isn't fun, but here's a guy who has been on the witness stand before, knows how to testify, and not just in this case, in other cases. So then the prosecution has to has to say, well, gee, he didn't get anything out of this. Nonsense.

(Id. at 3454-55.)

Now, the prosecution says, gee, he didn't ask for a deal. He didn't come out and say it. Hey, this guy knew the system. He knew how it worked. He knew that you don't have to come out and say like a contract like you're going to make a contract with somebody, "Hey, I am going to do this and you're going to do that." He knew that the story that he was putting-- piecing together and that's all it was, was going to be of interest to law enforcement and he began saying that to get himself out from this burglary charge.

(Id. at 3457.)

You had an opportunity right here to see the fence and you can see that any movement around that fence it's going to start banging and he's going to be discovered.

So the man is a pathological liar. He has gotten a lot for it and he made up this story originally to help himself out and it has been-- it hasn't been too bad for him, he has gotten 7,000 dollars worth of goods and services, and the services of Mr. Fontes picking up his groceries.

(Id. at 3489.)

Defense counsel was able to impeach Ybarra based on his past informant activity and the benefits provided through the witness protection program. But, the false statements from Fontes and Ybarra prevented defense counsel from presenting and arguing the significant evidence that Ybarra worked as an informant after the Alvarado murder and had continually requested and expected to receive money in exchange for his cooperation.

### d. Conclusion

When viewing Petitioner's Napue claim de novo, rather than under the deferential standards of AEDPA, the Court finds there is a reasonable likelihood that the cumulative effect of Ybarra and Fontes' false statements could have affected the judgment of the jury. It is apparent that the question of whether Ybarra was or was not credible based on his motivations as an informant was a central issue in this case. Had Ybarra and Fontes

testified truthfully at trial, the jury would have heard evidence that made Ybarra appear less credible. The jury would have heard additional evidence of Ybarra's informant activity and evidence that he was provided compensation directly relating to his testimony in Petitioner's case. Had Fontes and Ybarra not presented false testimony, defense counsel would likely have probed further into Ybarra's informant activity, in an attempt to further impeach Petitioner's credibility.

As a result, the prosecution's argument that Ybarra testified altruistically, as a friend of the victim, is much less believable when his relationship with the prosecutor is disclosed. The prosecution's insistence that Ybarra was provided benefits in the witness protection program only because of safety concerns also is far less credible. Given all the evidence now known, a reasonable jury could be asked and perhaps persuaded to question whether Ybarra's transfer to another county was as represented or to reward him in undisclosed ways for providing testimony. In light of all of the foregoing, a jury could have found Ybarra's testimony about Petitioner's plans to kill Alvarado less than credible, and that, in turn, could have produced a different decision regarding Petitioner's guilt.

There is, of course, other not insubstantial evidence supporting Petitioner's conviction. The Court does not here opine as to whether a jury informed of all the facts should have convicted or acquitted him. However, the Court cannot conclude that the other evidence was so overwhelming as to render the impact of Ybarra and Fontes' false statements negligible; the Court finds the impact sufficient to render it reasonably possible that a fully informed jury would have acquitted.

Having reviewed the cumulative effect of the false testimony, the court finds there is a "reasonable likelihood that it could have affected the judgment of the jury." Agurs, 427 U.S. at 103. Having found a material violation under Napue, the Court recommends that the petition for writ of habeas corpus be granted.

The Court having concluded that habeas relief should be granted, there is no reason for the Court to address the cumulative effect of the Brady and Napue violations.

## VI. Recommended Relief

It is well established that federal district courts have broad discretion in conditioning a judgment granting habeas relief. Hilton v. Braunskill, 481 U.S. 770, 775, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987). Pursuant to 28 U.S.C. § 2243, federal courts are authorized to dispose of habeas corpus matters "as law and justice require." "In modern practice, courts employ a conditional order of release in appropriate circumstances, which orders the State to release the petitioner unless the State takes some remedial action, such as to retry (or resentence) the petitioner." Harvest v. Castro, 531 F.3d 737, 741-742 (9th Cir. 2008) (citing Wilkinson v. Dotson, 544 U.S. 74, 89, 125 S. Ct. 1242, 161 L. Ed. 2d 253 (2005); Herrera v. Collins, 506 U.S. 390, 403, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993); Hilton v. Braunskill, 481 U.S. 770, 775, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987) ("[T]his Court has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court.")); see also Nettles v. Grounds, 830 F.3d 922, 930 (9th Cir. 2016). "[C]onditional orders are essentially accommodations accorded to the state, in that conditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one. The consequence when the State fails to replace an invalid judgment with a valid one is always release." Harvest v. Castro, 531 F.3d at 742 (quotations omitted).

Accordingly the Court recommends that Petitioner be ordered released within ninety (90) days of the adoption of the instant Findings and Recommendation by the District Court Judge unless Respondent notifies the Court of the state's intent to retry Petitioner.

## VI. Conclusion and Recommendation

Accordingly, IT IS HEREBY RECOMMENDED that the Court find that Petitioner is entitled to relief with regard to claim two of the Petition for Writ of Habeas Corpus and that Petitioner be GRANTED conditional release.

This Findings and Recommendation is submitted to the assigned District Judge, under 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The Finding and Recommendation will then be submitted to the District Court for review of the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   April 17, 2018       /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE